******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* GREGORY
JOHN POMPEI
(SC 20530)

Robinson, C. J., and D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

Convicted of two counts of the crime of interfering with an officer, the
defendant appealed, claiming that the trial court had improperly denied
his motion to suppress certain evidence obtained after a police officer,
L, positioned his cruiser behind the defendant's car and blocked the
defendant's egress from the parking lot in which he was parked. L had
reported to the parking lot in response to a dispatch concerning a
possibly unconscious man in a parked car. L eventually aroused the
defendant by tapping on the driver's side window, and, when the defen-
dant lowered the window, L smelled alcohol. The defendant was uncoop-
erative and slurring his words, and subsequently was arrested. Prior to
trial, the defendant moved to suppress the evidence of his statements
and actions in the parking lot, claiming that he had been seized in
violation of the fourth amendment as soon as L positioned his cruiser
behind the defendant's car and prevented him from leaving. The trial
court denied the motion to suppress, concluding that the defendant's
encounter with L did not become a seizure until after the defendant
awoke and lowered the window, as, up until that point, L was checking
on the defendant's well-being pursuant to his community caretaking
function rather than engaging in an investigatory stop. The court further
concluded that, once the defendant awoke and began to interact with
L, L had a reasonable and articulable suspicion that the defendant had
been operating his vehicle under the influence of alcohol. On the defen-
dant appeal, *held* that the trial court properly denied the defendant's
motion to suppress on the ground that L was acting in his community
caretaking capacity when he positioned his cruiser behind the defen-
dant's car, as the limited intrusion on the defendant's liberty was reason-
able and justified under the fourth amendment: L's arrival in the parking
lot was in response to information, which made no mention of erratic
driving or possible drunkenness, from a concerned citizen about an
unconscious man in a parked car at nearly 2 a.m., L did not activate
his lights, and, consistent with his purpose of determining whether the
defendant required medical attention, L's first question upon arousing
the defendant was whether he was okay; moreover, L testified that he
positioned his cruiser where he did to ensure that the defendant's car
did not roll backward or backup while he was ascertaining the situation,
and there was no evidence that L was engaging in a general exploratory
or pretextual stop when he parked his cruiser behind the defendant's car.

Argued January 11—officially released April 26, 2021*

*Procedural History*

Two part substitute information charging the defen-
dant, in the first part, with the crime of operating a
motor vehicle while under the influence of intoxicating
liquor or drugs and two counts of the crime of interfer-
ing with an officer, and, in the second part, with
operating a motor vehicle while his license was under
suspension, brought to the Superior Court in the judicial
district of Hartford, geographical area number fourteen,
where the court, *Prats, J.*, denied the defendant's
motion to suppress certain evidence; thereafter, the
case was tried to the jury before *Prats, J.*; verdict and
judgment of guilty of two counts of interfering with an
officer, from which the defendant appealed. *Affirmed.*

*Jerald M. Lentini*, with whom was *Robert T. Fontaine*, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, *Gail P. Hardy*, former state's attorney, and *Brenda L. Hans*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ECKER, J. A jury found the defendant, Gregory John Pompei, guilty of two counts of interfering with an officer in violation of General Statutes § 53a-167a (a). The sole issue on appeal is whether the trial court properly denied the defendant's pretrial motion to suppress alleging that the defendant was seized in violation of the fourth amendment to the United States constitution when a marked police cruiser blocked the egress of his motor vehicle, which was parked with its engine running and the defendant asleep in the driver's seat. The state claims that no violation of the fourth amendment occurred because the responding officer was not engaged in an investigatory stop involving criminal activity but, rather, was checking on the defendant's well-being pursuant to the officer's community caretaking function. We agree with the state and affirm the judgment of conviction.

The record reflects the following facts found by the trial court after an evidentiary hearing on the defendant's motion to suppress evidence, as supplemented by the undisputed testimony of the arresting officer. On October 5, 2017, at approximately 1:56 a.m., Officer John Loud of the Manchester Police Department was on a routine patrol when he received a dispatch regarding a "possibly unconscious [male] in a white Ford Focus parked at Cumberland Farms . . . ." Upon arriving at Cumberland Farms, Loud parked his patrol car behind the Focus in order "to keep it from being able to roll backwards or backup until [he] could ascertain the situation at hand." When he approached the Focus, Loud observed a male, whom he later identified as the defendant, sleeping or unconscious in the driver's seat with the key in the ignition and the engine running.

Loud attempted to rouse the defendant "to ascertain [his] physical well-being." The officer knocked "[v]ery hard" on the driver's side window, and the defendant eventually awoke. The defendant rolled down the window, and Loud asked whether he was okay. The defendant responded, "I'm fine." Loud immediately smelled the odor of alcohol emanating from the defendant.

Loud asked the defendant for his name and identification. The defendant responded with his first name, but Loud could not ascertain with clarity if his name was Craig or Greg because the defendant was mumbling and slurring his words. When asked for his last name, the defendant kept repeating his first name. The defendant indicated that his identification was in the trunk. When the defendant exited the car and walked to the trunk to retrieve his identification, he appeared to be unbalanced and had to hold on to the vehicle to keep himself steady. After the defendant opened the trunk of the Focus, Loud observed in plain view two twelve-packs of Bud Light; one pack was empty, and the other

appeared to have a few bottles missing.

The defendant never found his identification and was uncooperative about giving his full name to Loud and a second police officer who had arrived on the scene. The officers spotted a piece of mail with the defendant's name and, on that basis, were able to confirm his identity. The engine of the car was running during the entire encounter, and the defendant kept repeating, "I don't know how I got here." The officers contacted dispatch and discovered that the defendant's driver's license had been suspended.

The defendant kept trying to walk away from the officers despite their verbal commands to stop. Loud decided to restrain the defendant in order to "continue his investigation, based [on] what he noted at this point, the odor of alcohol, the defendant's inability to perform on the undivided tasks, his slurred speech, and his gait . . . ." Loud attempted to handcuff the defendant, but the defendant resisted by clenching and pulling away. The officers then called for backup. With the assistance of additional officers, the defendant finally was restrained, placed in handcuffs, and taken to the Manchester Police Department.

The defendant was charged with one count of operating under the influence of alcohol in violation of General Statutes § 14-227a (a) (1) and two counts of interfering with an officer in violation of § 53a-167a (a).[1] Prior to trial, the defendant moved to suppress the evidence of his statements and actions in the Cumberland Farms parking lot, claiming that he was seized in violation of the fourth amendment the moment his "vehicle was blocked and [he was] unable to leave." The trial court held an evidentiary hearing on the defendant's motion. Following that hearing, the trial court concluded that "Loud's initial encounter with the defendant was in his community caretaking capacity. . . . Loud was not engaged in an investigatory stop of criminal activity but, rather, was acting in [the] capacity of the [wellness] check or community caretaking function." The trial court elaborated that "[t]he facts in this case [support the conclusion] that the officer was acting only on information from the concerned citizen that the person was either asleep or unconscious in a parked car. There was no mention that the person might be drunk or engaging in erratic driving. The officer, when he arrived, never engaged his police lights. He parked the [patrol] car behind the defendant for security reasons, and he observed a person who was either sleeping or unconscious in the parked car, and the engine was running. The officer knocked on the window to ask if the defendant was okay. There was never a display of any physical force or . . . any threats made to the defendant by the officer. Therefore, up to this point, there ha[d] been no intrusion [on] any constitutionally protected rights."

The trial court determined that the defendant's encounter with Loud did not become a seizure until after "the defendant woke up and rolled down his window and the officer smelled alcohol coming off of his body . . . ." The smell of alcohol was the "first indici[um] that this may not be a [wellness] check at all, but that this [was] turning into a motor vehicle investigatory stop . . . ." The trial court further concluded that Loud "developed a reasonable and articulable suspicion that the defendant had been operating a motor vehicle while under the influence of alcohol when he smelled the odor of alcohol on the defendant emanating from the car," heard the defendant's "mumbling" and "slurring" speech, observed the defendant's "unsteady gait," and found "two twelve-packs of beer that were in clear view when the defendant opened his [trunk] . . . ." Accordingly, the trial court denied the defendant's motion to suppress.

Following a jury trial, the defendant was found not guilty of driving under the influence of alcohol but found guilty of both counts of interfering with an officer. The trial court rendered judgment consistent with the jury's verdict and sentenced the defendant to one year imprisonment, execution suspended after thirty days, followed by one year of probation, on each count of interfering with an officer. The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

On appeal, the defendant does not challenge the trial court's determination that, once Loud smelled the odor of alcohol, reasonable, articulable suspicion of criminal activity existed to justify the defendant's detention under *Terry* v. *Ohio*, 392 U.S. 1, 21–22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Instead, the defendant challenges the trial court's conclusion that there was no fourth amendment violation prior to the *Terry* stop, arguing that the community caretaking exception "is . . . irrelevant" to the present case because the defendant was seized "the moment . . . Loud pulled behind the defendant's vehicle and blocked his egress . . . ." The state responds that the trial court properly denied the defendant's motion to suppress on the ground that Loud was acting in a community caretaking capacity when he parked his police cruiser behind the defendant's vehicle.[2] Alternatively, the state argues that, even if the trial court improperly denied the defendant's motion to suppress, the record is inadequate to demonstrate harm.[3]

The standard of review for a motion to suppress is well settled. "A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen a question of fact is essential to the outcome of a particu-

lar legal determination that implicates a defendant's constitutional rights, [however] and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [W]here the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Kendrick*, 314 Conn. 212, 222, 100 A.3d 821 (2014). Consistent with this general standard, in reviewing the applicability of the community caretaking exception, the trial court's "subordinate factual findings will not be disturbed unless clearly erroneous and the trial court's legal conclusion regarding the applicability of the [community caretaking] doctrine in light of these facts will be reviewed de novo." (Internal quotation marks omitted.) *State* v. *DeMarco*, 311 Conn. 510, 518–19, 88 A.3d 491 (2014).

The fourth amendment to the United States constitution prohibits unreasonable searches and seizures by government agents.[4] "Subject to a few well defined exceptions, a warrantless search and seizure is per se unreasonable. . . . The state bears the burden of proving that an exception to the warrant requirement applies when a warrantless search [and seizure have] been conducted." (Citations omitted; internal quotation marks omitted.) *State* v. *Rolon*, 337 Conn. 397, 409, 253 A.3d 943 (2020).

The exception to the fourth amendment's warrant requirement applicable to the present case is known as the community caretaking exception. The community caretaking exception has "evolve[d] outside the context of a criminal investigation and does not involve probable cause as a prerequisite for the making of an arrest or the search for and seizure of evidence." (Internal quotation marks omitted.) *State* v. *Fausel*, 295 Conn. 785, 794, 993 A.2d 455 (2010). This exception does not give police officers carte blanche to effectuate searches and seizures in the absence of probable cause or a warrant issued by a neutral and detached judicial officer. The police must have a valid reason "grounded in empirical facts rather than subjective feelings" to believe that a limited intrusion into liberty or property interests is justified for the exception to apply. (Internal quotation marks omitted.) Id., 795. "It is an objective and not a subjective test"; (internal quotation marks omitted) id.; that "looks to the totality of the circumstances."[5] *State* v. *DeMarco*, supra, 311 Conn. 535.

The community caretaking exception was first recognized by the United States Supreme Court in *Cady* v. *Dombrowski*, 413 U.S. 433, 93 S. Ct. 2523, 37 L. Ed. 2d

706 (1973). The defendant in *Cady* was convicted of murder after incriminating evidence was found during a warrantless search of his motor vehicle following an automobile accident. Id., 434, 442. The police officers searched the defendant's motor vehicle because they knew that he was an off duty Chicago police officer who was required by regulation to carry his service revolver at all times. Id., 436–37. The court in *Cady* rejected the defendant's contention that the search was illegal, concluding that the search "was 'standard procedure in [that police] department,' to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands." Id., 443. The court reasoned that police officers frequently "engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Id., 441. The police had not violated the defendant's fourth amendment rights when they searched the trunk of his parked vehicle, the court held, because they reasonably believed that it contained a loaded revolver that could endanger the public if left unsecured. Id., 447.[6]

This court followed *Cady* in *State* v. *Tully*, 166 Conn. 126, 348 A.2d 603 (1974), in which we recognized that a police officer acting in a community caretaking capacity may make "a reasonable intrusion not prohibited by the fourth amendment." Id., 133. In *Tully*, a police officer discovered marijuana in plain view when he made a warrantless intrusion into a car for "the purpose of removing a guitar from the motor vehicle for [safekeeping]." (Internal quotation marks omitted.) Id., 129. We held that the trial court properly denied the defendant's motion to suppress the marijuana, partly because there was "no evidence that this was a general exploratory search on the part of the policeman on the pretext of protecting the defendant's property . . . . On the contrary, the [trial] court expressly found that the purpose of the officer's entry was to remove the guitar for safekeeping." Id., 136. Furthermore, the defendant "was unable to obtain anyone to remove" the vehicle, which was parked in a vacant lot and "incapable of being secured" due to a missing vent window. (Internal quotation marks omitted.) Id., 137. Under these circumstances, "[w]here there [was] no indication that a search for evidence of a crime was being made . . . [and] . . . [w]here a search is conducted as a service to an individual . . . evidence of a crime accidentally discovered need not be suppressed." (Citation omitted; internal quotation marks omitted.) Id.; see also *State* v. *Foote*, 85 Conn. App. 356, 362, 857 A.2d 406 (2004) (holding that officer who seized disabled vehicle on side of road initially "was not engaged in an investigatory stop of criminal activity, but rather was acting in accordance with his community caretaking function"), cert. denied, 273 Conn. 937, 875 A.2d 44 (2005), and

cert. denied, 273 Conn. 937, 875 A.2d 43 (2005).

Applying these principles to the present case, we conclude that the intrusion on the defendant's liberty in the Cumberland Farms parking lot was reasonable under the fourth amendment because Loud was acting in a community caretaking capacity when he parked his patrol car behind the defendant's vehicle, knocked on the window, and inquired about his well-being. The evidence supports the trial court's determination that Loud was not acting in a criminal investigatory capacity when he parked his patrol car behind the defendant's motor vehicle but, rather, was responding to a dispatch from a concerned citizen who had reported an unconscious male in a Ford Focus in the Cumberland Farms parking lot at 1:56 a.m. Loud did not activate the lights on his patrol car and parked behind the defendant's vehicle because he wanted "to keep it from being able to roll backwards or backup until [he] could ascertain the situation at hand." Loud exited his patrol car and observed the unconscious or sleeping defendant in the driver's seat with the engine running. Loud knocked on the driver's side window to rouse the defendant and to ascertain whether he required medical attention. Indeed, consistent with this purpose, the first question Loud asked the defendant was whether he was okay. In light of the limited "purpose and scope of the intrusion," as well as the complete dearth of evidence indicating that "this was a general exploratory" or "pretext[ual]" stop; *State* v. *Tully*, supra, 166 Conn. 136, 138; we conclude that the defendant's encounter with Loud falls squarely within the community caretaking doctrine.[7]

The judgment is affirmed.

In this opinion the other justices concurred.

* April 26, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The defendant also was charged in a part B information with one count of operation of a motor vehicle with a suspended license in violation of General Statutes § 14-215 (c) (1). The disposition of this charge is unclear from the record.

[2] The state also contends that the defendant's claim is unreviewable because he abandoned it in the trial court and failed to brief it adequately in this court. We disagree. In the trial court, defense counsel argued that the defendant was seized the moment the defendant's "vehicle was blocked and [he was] unable to leave." Although defense counsel later conceded that the defendant "was asleep at this time and would not have known that he was blocked in," defense counsel nonetheless maintained that "[a] reasonable person awakened [by] a forceful knocking by [the] police with a police car blocking him in late at night is not going to feel free to terminate the encounter. . . . [The defendant] was effectively constitutionally seized at the moment that [Loud] blocked him in and he became aware of the fact that he was blocked." Thus, defense counsel consistently maintained that the defendant was seized *before* Loud smelled the odor of alcohol and there was a reasonable, articulable suspicion to justify the defendant's detention. We therefore conclude that the defendant's fourth amendment claim was not abandoned in the trial court.

The state also contends that the defendant's fourth amendment claim is unreviewable due to inadequate briefing because the defendant simply alleges that "the community caretaking exception is irrelevant." We agree with the state that the defendant's analysis of the community caretaking exception to the fourth amendment's warrant requirement is somewhat

conclusory, but we nonetheless exercise our discretion to review the defendant's claim. See, e.g., *Ward* v. *Greene*, 267 Conn. 539, 546, 839 A.2d 1259 (2004) (exercising discretion to review claim even though appellant had "failed to analyze in depth the issues presented").

[3] The defendant has not provided this court with the transcripts of the trial, and the state claims that, in the absence of such transcripts, the record is inadequate to establish that the challenged evidence was presented to the jury in support of the crimes of conviction. In light of our conclusion that the trial court properly denied the defendant's motion to suppress, we need not address the state's argument. See, e.g., *State* v. *Salgado*, 257 Conn. 394, 400 n.9, 778 A.2d 24 (2001).

[4] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV.

The fourth amendment's protection against unreasonable searches and seizures is made applicable to the states through the due process clause of the fourteenth amendment. See, e.g., *Mapp* v. *Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

[5] Both *Fausel and DeMarco* involve the emergency doctrine, which "is rooted in the community caretaking function of the police . . . ." *State* v. *Blades*, 225 Conn. 609, 619, 626 A.2d 273 (1993); see also *State* v. *DeMarco*, supra, 311 Conn. 536–40; *State* v. *Fausel*, supra, 295 Conn. 799–802. Although the emergency doctrine and the community caretaking doctrine have a common origin, they are two separate and distinct exceptions to the fourth amendment's warrant requirement. As we explain in greater detail in this opinion, the community caretaking exception involves routine, nonemergency duties undertaken to protect the public, whereas the emergency doctrine requires state actors to have a reasonable belief "that life or limb is in immediate jeopardy and that the intrusion [on the defendant's liberty] is reasonably necessary to alleviate the threat." (Internal quotation marks omitted.) *State* v. *DeMarco*, supra, 536.

[6] We recognize that the United States Supreme Court has granted certiorari to consider whether the community caretaking exception to the fourth amendment's warrant requirement extends to the home. See *Caniglia* v. *Strom*, U.S. , 141 S. Ct. 870, 208 L. Ed. 2d 436 (2020). Compare *Caniglia* v. *Strom*, 953 F.3d 112, 124 (1st Cir. 2020) (applying community caretaking exception to warrantless intrusion of defendant's home but noting that "the doctrine's reach outside the motor vehicle context is ill-defined and admits of some differences among the federal courts of appeals"), cert. granted, U.S. , 141 S. Ct. 870, 208 L. Ed. 2d 436 (2020), with *Sutterfield* v. *Milwaukee*, 751 F.3d 542, 554 (7th Cir.) ("taking the narrow view [of the community caretaking exception that] . . . has confined the doctrine to automobile searches" but noting that "state and federal courts have divided over the scope of the community caretaking doctrine recognized in *Cady*"), cert. denied, 574 U.S 993, 135 S. Ct. 478, 190 L. Ed. 2d 362 (2014). Because the present case does not involve the warrantless intrusion into a home, the outcome of *Caniglia* has no bearing on the resolution of this appeal.

[7] The defendant argues that he was seized in violation of the fourth amendment pursuant to *State* v. *Edmonds*, 323 Conn. 34, 145 A.3d 861 (2016), in which this court determined that an unlawful seizure had taken place when, inter alia, "two marked police cruisers converged on the defendant from opposite directions, effectively blocking him from exiting the [parking] lot . . . ." Id., 57. We reject the defendant's contention that this case is analogous to *Edmonds*. In *Edmonds*, the defendant's initial encounter with law enforcement originated as a result of an investigation into potential criminal activity. See id., 40–41. No such suspicion of potential criminal activity existed when Loud approached the defendant. We consider *Edmonds* inapposite.