******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* ANDREW SAMUOLIS
## (SC 20299)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

Pursuant to the emergency exception to the warrant requirement of the fourth amendment to the United States constitution, the police are permitted to enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury.

Convicted of the crimes of murder, assault in the first degree, and attempt to commit assault in the first degree, the defendant appealed to this court, claiming that the trial court improperly had denied his motion to suppress certain evidence seized by the police as a result of their warrantless entry into his home. Prior to the challenged entry, the defendant's neighbor contacted the police because he and other neighbors were concerned that they had not seen the defendant's father, S, who lived with the defendant, in a long time. Thereafter, two police officers were dispatched to the defendant's residence to check on S's well-being. The officers assessed the exterior of the residence, knocked on the doors, and called into open windows but received no response and concluded that no one was home. Immediately after the well-being check, one of the officers was told by his supervising officer that the defendant had, or possibly had, mental health issues. Four days later, the defendant's neighbor again contacted the police and requested another well-being check. The officers conducting the second well-being check were warned that the defendant was possibly a mentally disturbed person. Upon their arrival, the officers spoke with the neighbor, who told them that, after the previous visit by the police, the defendant covered the lower rear windows with chicken wire. The neighbor also indicated that he noticed a mass of flies around the upper rear window of the residence. One of the officers believed, based on his prior experience, that the sheer number of flies indicated that there might be a dead body inside the house. Using a ladder, one of the officers climbed to the upper rear window, which had been propped open slightly with an air freshener. There were flies everywhere but no odor. The officer looked into the window but was unable to see anything noteworthy. Both officers then contacted their supervisor because they believed that entry into the residence might be necessary for the well-being of both S and the defendant. After arriving at the residence and being apprised of the situation, the supervisor concluded that there was a dead body in the home and that they would need to enter the residence to see if anyone inside needed assistance. One of the officers thereafter cut a screen and entered the residence through an open second floor window. After announcing his presence and not receiving a response, the officer went downstairs and opened the front door. The defendant then shot the officer and fled the residence. Soon thereafter, the defendant was apprehended, and the officers entered the home to secure it and to search for any injured persons. Police officers eventually found a badly decomposed body on the second floor. Thereafter, the police obtained a search warrant, and the defendant voluntarily gave a statement to the police in which he admitted that he had shot S several months earlier and that, when S's body started to smell, he sealed the room in which it was located. In denying the defendant's motion to suppress the seizure of S's dead body, the trial court concluded, inter alia, that the officers' entry into the home was justified under the emergency exception to the warrant requirement because that entry was objectively reasonable under the totality of the circumstances. On appeal, the defendant claimed, inter alia, that the facts did not provide an objectively reasonable basis for the police officers to conclude that there was an emergency justifying a warrantless entry into his residence. *Held* that, under the totality of the circumstances, it was objectively reasonable for the officers to conclude that there was an emergency justifying their initial

entry into the defendant's home, and, accordingly, the trial court properly denied the defendant's motion to suppress: the defendant could not prevail on his claim that it was unclear, in light of the United States Supreme Court's decision in *Caniglia* v. *Strom* (141 S. Ct. 1596), whether a warrantless entry into a home is still permitted to assist a person who is injured or facing imminent injury, as this court found no such ambiguity in that decision and observed that other courts have continued to apply the emergency exception post-*Caniglia*; moreover, although the state did not meet its burden of establishing that it was objectively reasonable for the officers to believe that the defendant required emergency assistance, it did meet its burden of establishing that it was objectively reasonable for the officers to believe that S required immediate emergency assistance, as the record indicated that S was an elderly man who had not been seen by any of his neighbors for at least one month, the family's only vehicle had not been moved since S was last seen, S did not respond to the officers' knocks on the door or shouts into the open windows, and there was an extraordinary infestation of flies around the upper rear window of the residence, which led the officers to believe, on the basis of their past experience, that the most likely explanation for the infestation was the presence of a dead body, and which also left open the possibility that an occupant might be injured rather than dead; furthermore, the defendant's mental condition was a relevant factor in the officers' calculation of whether S needed emergency assistance and what actions were necessary to provide that assistance, as the defendant's conduct in attempting to fortify the home against intruders and in refusing to answer the door would have indicated to the officers that they were not going to be able to obtain timely information from the defendant about the whereabouts or condition of S, and the defendant's failure to remediate the fly infestation in plain view reasonably suggested that his mental condition may have impaired his capacity to appreciate the gravity of the conditions that existed and the need to elicit prompt medical assistance; in addition, there was no merit to the defendant's contentions that the officers' actions in driving to the residence without activating their emergency lights or sirens and waiting for their supervisor's approval before entering the residence indicated that they did not perceive the situation as an emergency, and that the officers failed to consider alternative explanations for the facts presented that would indicate that no emergency existed.

Argued March 24—officially released August 9, 2022

*Procedural History*

Three substitute informations charging the defendant, in the first case, with two counts of the crime of attempt to commit assault in the first degree and, in the second case, with two counts of the crime of attempt to commit assault in the first degree and one count of the crime of assault in the first degree, and, in the third case, with the crime of murder, brought to the Superior Court in the judicial district of Windham, where the cases were consolidated; thereafter, the court, *J. Fischer, J.*, denied the defendant's motion to suppress certain evidence; subsequently, the charge of murder was tried to a three judge panel, *A. Hadden, J. Fischer* and *Solomon, Js.*, and the remaining charges were tried to the court, *J. Fischer, J.*; judgments of guilty of murder and one count each of attempt to commit assault in the first degree and assault in the first degree, from which the defendant appealed to this court. *Affirmed.*

*Jeffrey C. Kestenband*, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom were *Andrew J. Slitt*, senior assistant state's attorney, and, on the brief, *Anne F. Mahoney*, state's attorney, for the appellee (state).

*Opinion*

KELLER, J. Following a trial to the court, the defendant, Andrew Samuolis, was convicted of murder in violation of General Statutes § 53a-54a, assault in the first degree by means of the discharge of a firearm in violation of General Statutes § 53a-59 (a) (5), and attempt to commit assault in the first degree by means of the discharge of a firearm in violation of General Statutes §§ 53a-49 and 53a-59 (a) (5). In his direct appeal to this court; see General Statutes § 51-199 (b) (3); the defendant challenges only his murder conviction. The sole issue is whether the trial court properly denied the defendant's motion to suppress evidence seized from his home, specifically, the dead body of the defendant's father, John Samuolis, on the grounds that (1) the police officers' warrantless entry into the Samuolis home was justified under the emergency exception to the warrant requirement of the fourth amendment to the United States constitution, or, alternatively, (2) the defendant's alleged actions in shooting at the officers upon their initial entry attenuated the taint from that unlawful initial entry and justified their subsequent reentries into the home. We affirm the trial court's judgment on the basis of the first ground.

The trial court made the following findings of fact. "On [Friday] June 21, 2013, Willimantic Police Officer[s] [Amy] Hartman [and Elvin Salas were] dispatched to 31 Tunxis Lane [in Willimantic] to check on the well-being of John Samuolis [Samuolis], the owner of the property. Earlier in the day, [Salas] had been on routine patrol on the street and hailed by Mark Curtis, who lived next door to Samuolis. Curtis related that he and the neighbors across the street, [Andy and Shirley Lebiszczak], were concerned that they had not seen [Samuolis], who was referred to as the 'old man,' in a long time. . . .

"At about 7:30 that evening, [while it was still light out] . . . Salas and Hartman arrived . . . at [31] Tunxis Lane, which is a split-level style home [on a cul-de-sac] in a residential neighborhood described as 'quiet.' . . . A car . . . was parked in the driveway. Some of the [second floor] windows of the house were open and part[s] of the lawn had been mowed recently. There was no visible accumulation of trash or mail. The officers walked around the house and knocked on the doors, which were locked. They noticed a cat in the window. Salas called into the open windows announcing their presence, but they received no response. They concluded that no one was home.

"The officers then spoke with Curtis and the Lebiszczaks and learned that the house was occupied by [Samuolis] and his adult son, [the defendant], and that the [defendant's] mother . . . was deceased. The neighbors also noted that [the defendant] was 'a little weird'

and 'not all there' and that he might be in the house. . . . The officers intended to return later that evening to recheck the house but . . . other duties . . . prevented them from returning.

"On [the morning of Monday] June 25, 2013 . . . Curtis called the Willimantic Police [Department] and asked them to recheck the Samuolis house because [of changes since the prior visit, namely] there was now chicken wire covering the lower rear windows of the house and there were a huge number of flies massing at an upper rear window. [Officer Kevin] Winkler was dispatched to the scene, and . . . Salas responded as back up when he recognized the address being broadcast. . . . [N]either officer used [his] lights or sirens on [his] way to 31 Tunxis Lane. . . . Since Salas' earlier visit, the weather had been extremely hot and dry.

"Both officers exited their vehicles and walked around the house. They found the doors were all locked and all the curtains were [now] drawn. The front upper windows of the house were open. Salas saw [that] the car was still parked in the same place and ran the [license] plate. The registration came back to 31 Tunxis Lane. Salas did not check to see if any other vehicles were registered to the house.

"The officers also had a short discussion with Curtis, who told them that [the defendant] had put the chicken wire up after the police had left the home [following] the previous well-being check.[1] Curtis also pointed out the mass of flies at the upper rear window. Salas told Winkler that neither the wire nor the flies had been there earlier. Salas, based on his experience, thought that the sheer number of flies indicated that there might be a dead body in the house.

"Curtis offered the use of a ladder, and Winkler put it in place and climbed up to look into the upper rear window. The window was propped open slightly by an air freshener. There were flies everywhere, but no odor. Winkler looked in but was unable to see anything. The officers did not have a phone number for the house; nor did they ask Curtis [if he had] any contact information. The officers were now concerned for the well-being of the 'old man,' [Samuolis], and his son, [the defendant], due to his possible 'state of mind.'

"Salas and Winkler thought that an entry into the house might be necessary, so they called their supervisor, Sergeant [Roberto] Rosado, and related what they had found. Rosado came to the scene without using his lights and siren, [arriving a few minutes later] . . . . After being apprised of the current situation and what had transpired on June 21, Rosado concluded that there was a dead body in the house and that they would have to make an entry into the house in order to search for it and anyone else who might need help. . . . [T]hese officers . . . did not believe that criminal activity had

occurred. . . . Winkler move[d] [the ladder around the house] to the front upper windows to gain entry [into a better lit room].[2] The officers testified that they would have handled the issues differently if they were not in community caretaking mode.[3] . . .

"Winkler then ascended the ladder [and] cut the window screen . . . . He told Rosado and Salas that he would go down and open the front door and let them in. . . . [After he entered the second floor of the residence] Winkler heard a noise from the basement. Winkler stopped and announced his presence as a police officer and waited, but he heard nothing in response. Winkler then went down the stairs to the front door, which was barred by a heavy metal bar. He removed the bar and tossed it . . . toward the basement . . . . Winkler then opened the front door . . . while keeping an eye on the basement . . . .

"At that point, Winkler saw a rifle barrel stick out around the wall at the bottom of the basement stairs carried by a male who was dressed 'for battle' in camouflaged clothing and a ballistic style vest. The male aimed and fired the weapon at Winkler, hitting him in the elbow. This male was later identified as the defendant . . . ."[4] (Footnotes added.)

The officers then fled from the home. Salas saw the defendant run through the backyard of the house carrying the rifle and disappear into the woods. Rosado radioed police dispatch and reported what had occurred, and, thereafter, other officers arrived at the scene to assist. Detective Lucien Frechette received a text message that a Willimantic police officer had been shot and drove to the police station, where "he gathered information about the residence and the family, including a phone number. Frechette donned protective gear and went to the command center, which had been set up a short distance from 31 Tunxis Lane. Frechette asked for and received permission to call the phone number he had, and then he called it from the command center. No one answered the call, and he left a message on a recording device."

At about 12:53 p.m., the state police reported that they had captured the defendant and that he was in their custody. "As soon as Frechette and the other officers learned that the defendant was in custody, he and other [special operations officers] entered the house to secure it and [to] search for any injured parties. This was at about 1:02 p.m. Frechette observed that the door to the rear second floor bedroom was sealed with tape and plastic and a rope. Suspecting [that] it might be booby-trapped, Frechette ordered everyone out of the house . . . .

"Once outside, Frechette went up a ladder to the rear second floor window and raised the window enough to lean inside. The flies were still thick. Frechette saw a badly decomposed body on the floor directly below

the window [wrapped in plastic]. He also visually inspected the room for booby traps, but found nothing. No physical evidence was seized during this protective sweep. The Connecticut State Police then procured a search warrant, which was executed later, and physical evidence [including what was later confirmed to be the dead body of Samuolis] was seized."

While these events were unfolding, the defendant waived his rights and voluntarily gave a statement to Connecticut State Police Detective Adam Pillsbury. Prior to taking the defendant's statement, "Pillsbury did not know that [Samuolis] was dead or that his body was still in the house. The defendant told Pillsbury that the police had come to the house to check on his father. The defendant stated that he had shot his father several months before. He further stated that the body was still in the house, and it had started to smell so he sealed the room. Pillsbury then called his superiors to tell them that there was a body in the house."

The defendant was charged with murder, assault in the first degree, and several counts of attempt to commit assault in the first degree. The defendant filed a motion to suppress the evidence seized from the warrantless entry into his home. The state objected to the motion on the ground that entry was justified under the emergency doctrine and other theories. During the hearing on the motion, testimony was adduced from a number of police officers and Curtis. The trial court expressly found that all of the witnesses were credible and none of their testimony was in substantial conflict.

Because two matters that were the subject of this testimony have particular significance to this case— the information provided to the officers about the defendant prior to entering the home and the nature of the conditions that the officers encountered—we elaborate on the testimony that supported the trial court's findings as to those two matters.[5] With regard to information about the defendant, the officers initially entering the home were specifically made aware that the defendant had, or possibly had, mental deficiencies. Right after the initial well-being check, Salas was told by his supervising officer, who was familiar with the Samuolis family, that the defendant had "[m]ental health issues." The dispatch to the officers for the second well-being check also was coded to indicate that the defendant was a possible "file 18," a code that meant "a possible mentally disturbed or mentally malfunctioning person."

With regard to the changed conditions that the officers encountered since the first visit, witnesses described the upper rear window of the house as follows: "totally caked with flies," you "[c]ouldn't even see glass" because it was "[l]oaded" with flies, and flies were "pretty much infesting the entire . . . window," appearing to be "both inside and out," "seem[ing] like they were coming through the window and siding

. . . ." The window directly below that window was now covered with chicken wire and a small hole had been cut in the blinds, which appeared to have been "staged . . . to be able to look outside . . . almost like a spy hole."

The trial court concluded, on the basis of the preceding facts, that the police entry into the home under the emergency doctrine was "objectively reasonable under the totality of the circumstances." The court pointed to the following circumstances: the police went to the home on both occasions to make a welfare check, not to investigate a crime; the presence of flies indicated to the officers the presence of a dead body; the "bizarre" and "inexplicable" act of covering the windows with chicken wire; the " 'old man' " remained missing; and there was a concern for the defendant's state of mind. The court found that the officers did not know for certain that there was a dead body in the home, or if there was, whose body it was, which left them reasonably concerned for the safety of "either an 'old man' or his son who had 'mental issues.' " The court concluded that, given the unsuccessful efforts of the police to make contact at the home and the circumstances presented, it was unnecessary for the police to obtain a telephone number to call the home or residents prior to their entry. Alternatively, the court determined that, even if the initial entry was unlawful, the defendant's alleged shooting of Winkler sufficiently attenuated that unlawful act from the subsequent lawful search and seizure of evidence. Accordingly, the trial court denied the defendant's motion to suppress.

At his trial to the court, the defendant raised the affirmative defense of lack of capacity to appreciate the wrongfulness of his conduct or to control his conduct due to mental disease or defect, specifically, autism spectrum disorder. The court found the defendant guilty of murder, assault in the first degree, and attempt to commit assault in the first degree. The court imposed a total effective sentence of forty-five years of imprisonment, followed by eight years of special parole. The defendant's direct appeal to this court, challenging only his murder conviction, followed.

The defendant claims that, even if a warrantless entry into a home is permitted to assist someone who is injured or facing imminent injury, there was no emergency justifying entry into his home. He argues that the objective facts did not provide a reasonable basis to believe that someone in the home was dead or in need of immediate aid, and that recovery of a dead body is not an emergency in any event. The defendant further contends that his alleged criminal conduct did not justify the subsequent entries into the home, which resulted in the illegal seizure.

The state claims that all of the entries were part of the same justifiable emergency. It further contends that,

if we conclude that an emergency did not exist when the police initially entered the home, we should conclude that it existed as a consequence of the defendant's shooting at the officers after they entered. Alternatively, the state contends that the evidence seized is admissible under the independent source doctrine because the home would have been searched pursuant to the search warrant issued in connection with the assault, or under the inevitable discovery doctrine, because the defendant independently confessed to the killing.

Our analysis begins with the observation that the defendant does not challenge any of the trial court's factual findings. His challenge instead is to the reasonableness of the conclusion drawn from those facts, namely, that they provided an objectively reasonable basis for the officers to conclude that there was an emergency justifying a warrantless entry into his home. See generally *State* v. *Pompei*, 338 Conn. 749, 756, 259 A.3d 644 (2021) ("[w]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights . . . and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence" (internal quotation marks omitted)). Our review of his claim therefore is plenary. See id.; cf. *United States* v. *Porter*, 594 F.3d 1251, 1256 (10th Cir. 2010) (existence of exigent circumstances is mixed question of law and fact, under which "[t]he ultimate question regarding the reasonableness of the search is a question of law which we review de novo" (internal quotation marks omitted)); *State* v. *Davis*, 331 Conn. 239, 246–47, 203 A.3d 1233 (2019) (de novo review was undertaken when factual findings were not challenged and claim was that those findings did not support conclusion that police had reasonable and articulable suspicion that defendant was engaged in criminal activity).

Settled principles of fourth amendment jurisprudence guide this inquiry. "It is a basic principle of [f]ourth [a]mendment law that searches and seizures inside a home without a warrant are presumptively unreasonable. . . . Entry by the government into a person's home . . . is the chief evil against which the . . . [f]ourth [a]mendment is directed." (Citation omitted; internal quotation marks omitted.) *State* v. *Fausel*, 295 Conn. 785, 793, 993 A.2d 455 (2010). "The warrant requirement protects an individual in his home from official intrusion whether the purpose of the search is to further a criminal investigation or the government's enforcement of an administrative regulation. *Camara* [v. *Municipal Court*, 387 U.S. 523, 530, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967)] ('[i]t is surely anomalous to say that the individual and his private property are fully protected by the [f]ourth [a]mendment only when the

individual is suspected of criminal behavior . . .').'" *State* v. *Vargas*, 213 N.J. 301, 313, 63 A.3d 175 (2013). Thus, "merely because police activities are 'divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute,' *Cady* [v. *Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973)], does not mean that persons have a lesser expectation of privacy in their homes, see *Camara* [v. *Municipal Court*, supra, 534] (concluding administrative searches constituted 'significant intrusions upon the interests protected by the [f]ourth [a]mendment')." *State* v. *Vargas*, supra, 325–26.

"As a result, [w]arrants are generally required to search a person's home . . . unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the [f]ourth [a]mendment. . . . *Brigham City* v. *Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006). Searches conducted pursuant to emergency circumstances are one of the recognized exceptions to the warrant requirement under both the federal and state constitutions. *State* v. *Blades*, 225 Conn. 609, 617–18, 626 A.2d 273 (1993).

"The emergency exception to the warrant requirement allows police to enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury. *Brigham City* v. *Stuart*, supra, 547 U.S. 400. . . . [T]he state actors making the search must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat.[6] . . . The test is not [however] whether the officers actually believed that an emergency existed, but whether a reasonable officer would have believed that such an emergency existed." (Citations omitted; footnote added; internal quotation marks omitted.) *State* v. *Fausel*, supra, 295 Conn. 794–95; see also *Michigan* v. *Fisher*, 558 U.S. 45, 47, 130 S. Ct. 546, 175 L. Ed. 2d 410 (2009) (addressing "emergency aid" exception).

"The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. . . . *Mincey* v. *Arizona*, 437 U.S. 385, 392, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978)." (Internal quotation marks omitted.) *State* v. *Fausel*, supra, 295 Conn. 794; see also *United States* v. *Barone*, 330 F.2d 543, 545 (2d Cir.) ("[t]he right of the police to enter and investigate in an emergency without the accompanying intent to either search or arrest is inherent in the very nature of their duties as peace officers, and derives from the common law"), cert. denied, 377 U.S. 1004, 84 S. Ct. 1940, 12 L. Ed. 2d 1053 (1964). "The state bears the burden of demonstrating that a warrantless entry falls within the emergency exception." (Internal quotation marks omitted.) *State*

v. *Fausel*, supra, 795.

In the present case, the trial court concluded that the police were confronted with an emergency but also emphasized the fact that the case had commenced as a well-being check and not as a criminal investigation. Although courts have recognized that the emergency aid doctrine has its roots in the police's caretaking function, as opposed to its law enforcement function,[7] this doctrine must be distinguished from what had been called the "community caretaking" exception to the warrant requirement. Many courts, including our own, have interpreted the United States Supreme Court's decision in *Cady* v. *Dombrowski*, supra, 413 U.S. 433, as recognizing a community caretaking warrant exception. See, e.g., *Sutterfield* v. *Milwaukee*, 751 F.3d 542, 553–54, 556–57 (7th Cir.), cert. denied, 574 U.S. 993, 135 S. Ct. 478, 190 L. Ed. 2d 362 (2014); *State* v. *Pompei*, supra, 338 Conn. 758. The court in *Cady* had sustained the warrantless search of an automobile in police custody that was conducted for a routine public safety purpose, noting that police officers frequently "engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady* v. *Dombrowski*, supra, 441. Following *Cady*, courts held that, under the community caretaking doctrine, when the police take actions "not for any criminal law enforcement purpose but, rather, to protect members of the public . . . searches . . . conducted for the latter purpose are deemed exempt from the [f]ourth [a]mendment warrant requirement." *Sutterfield* v. *Milwaukee*, supra, 553–54; see also id., 553 n.5 (acknowledging overlap and distinction between community caretaking exception and emergency aid exception); *Hunsberger* v. *Wood*, 570 F.3d 546, 554 (4th Cir. 2009) (noting overlap and distinction between community caretaking and exigent circumstances doctrines), cert. denied, 559 U.S. 938, 130 S. Ct. 1523, 176 L. Ed. 2d 113 (2010). State and federal courts have divided, however, over whether the community caretaking exception was limited to automobile searches or extended more broadly to include warrantless entry into a home. See *Sutterfield* v. *Milwaukee*, supra, 556–57 (citing cases).

The United States Supreme Court recently made clear that the mere fact that the police are acting solely for community caretaking purposes is not sufficient, in and of itself, to excuse warrant requirements for entry into a home. *Caniglia* v. *Strom*,    U.S.    , 141 S. Ct. 1596, 1599, 209 L. Ed. 2d 604 (2021); see id., 1598 (*Cady*'s acknowledgment of police's " 'caretaking' duties" did not create "a standalone doctrine that justifies warrantless searches and seizures in the home"). Significantly for our purposes, the court's majority opinion in *Caniglia*, as well as the three concurring opinions, underscored that the court's decision was not intended

to undermine settled law holding that no warrant is required to enter a home when there is a "need to assist persons who are seriously injured or threatened with such injury." (Internal quotation marks omitted.) Id., 1600 (Roberts, C. J., with whom Breyer, J., joins, concurring); see also id., 1599 (majority opinion); id., 1601–1602 (Alito, J., concurring);[8] id., 1603–1604 (Kavanaugh, J., concurring). The majority opinion made a point of noting that the courts below had relied exclusively on the so-called community caretaker warrant exception.[9] Id., 1599.

Although the defendant asserts in his brief to this court that it is unclear, in the wake of *Caniglia*, whether warrantless entry is still permitted to assist someone who is injured or facing imminent injury, we find no such ambiguity in that decision. Other courts have continued to apply the emergency exception post-*Caniglia*; see, e.g., *United States* v. *Sanders*, 4 F.4th 672, 677 (8th Cir. 2021), cert. denied, U.S. , 142 S. Ct. 1161, 212 L. Ed. 2d 36 (2022); *Gaetjens* v. *Loves Park*, 4 F.4th 487, 492–93 (7th Cir. 2021), cert. denied, U.S. , 142 S. Ct. 1675, 212 L. Ed. 2d 582 (2022); *McCarthy* v. *Commonwealth*, 73 Va. App. 630, 642–43, 864 S.E.2d 577 (2021); *State* v. *Ware*, 400 Wis. 2d 118, 127–28, 968 N.W.2d 752 (App. 2021); and the defendant has identified no case in which a court deemed the emergency exception no longer valid.

The issue before us, therefore, is whether there was an objectively reasonable basis for the responding officers to believe that there was a need to render emergency assistance to an injured occupant or to protect an occupant from imminent injury, either the defendant or Samuolis, when Winkler made the initial entry into the home. With regard to the defendant, we disagree that it would have been objectively reasonable for the officers to believe that he needed emergency assistance. There was every reason to believe that, in the days immediately preceding the initial warrantless entry, the defendant had performed tasks around the house. All of the evidence points to the defendant's being present at the home when the police first attempted to make contact with the occupants and thereafter actively seeking to avoid that contact. See *Florida* v. *Jardines*, 569 U.S. 1, 6, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013) ("[a]t the . . . very core [of the fourth amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion" (internal quotation marks omitted)). Without more, odd behavior that might be symptomatic of some sort of mental disability (placing chicken wire over windows, cutting a spy hole in window blinds, and leaving some parts of the lawn unmowed) does not reasonably indicate a need for *immediate* medical assistance, physical or mental. That the facts suggested that the defendant could be living in a house with a dead or decomposing body raises a concern of a different

magnitude, no doubt. It is significant that the state has not claimed that the police had reasonable cause to believe that the defendant suffered from a mental condition that would have permitted them to take him into custody for an emergency examination pursuant to General Statutes § 17a-503 (a),[10] and no specific findings were made to support the application of that statute.[11] Cf. *Sutterfield* v. *Milwaukee*, supra, 751 F.3d 545–46 (factor in assessing whether officers' entry to respond to concern about suicide threat was reasonable was whether officers had complied with statutory emergency detention procedure to provide involuntary treatment to those at risk of suicide); *State* v. *Hyde*, 899 N.W.2d 671, 676–77 (N.D. 2017) (same). Indeed, there is no indication that the officers sought to obtain any information that might better inform them as to the nature of the defendant's mental health issues or any concerns that these issues might present. Nor did they make a reasonable attempt to find less intrusive means to make contact with a possibly mentally impaired person, directly or through a friendly third party, than knocking on his door and then breaking into his home. See *Brigham City* v. *Stuart*, supra, 547 U.S. 403 ("the ultimate touchstone of the [f]ourth [a]mendment is 'reasonableness' "). We therefore conclude that the state did not meet its burden of establishing that immediate entry was necessary because the defendant required *emergency* aid. As we explain subsequently in this opinion, however, this does not mean that the defendant's mental condition was irrelevant to the officers' actions.

With regard to Samuolis, although we share some of the defendant's concerns about shortcomings in the officers' investigation prior to their entry into the home, we conclude that there was a reasonably objective basis for believing that an elderly occupant was in need of immediate medical assistance.[12] The "old man," Samuolis, had not been seen by any of his neighbors for at least one month, which was unusual enough that his absence was reported to the police. The Samuolis family's only vehicle had not been moved since Samuolis was last seen.[13] Samuolis did not respond to the officers' knocks on the door or shouts into the open windows. None of this would have been sufficient, however, in the absence of the extraordinary infestation of flies amassing around the upper rear window.

Two of the officers testified that, when they previously had encountered similar conditions, a dead body had been found. We need not decide, however, whether the presence of a dead body in a home would constitute an emergency.[14] Although the responding officers thought, based on their experience, that the most likely explanation for this fly infestation was the presence of a dead body, they also left open the possibility that an occupant might be injured rather than dead. We cannot say that this supposition was unreasonable. See *State* v. *Scott*, 343 N.C. 313, 329, 471 S.E.2d 605

(1996) (emergency doctrine was applicable when officer investigating missing person report noticed flies accumulating at door to underside of house and smelled odor of decaying flesh, and officer testified that he had previously encountered similar conditions and discovered, upon further investigation, live person with rotting feet). It is well documented that flies can be strongly attracted to uncovered wounds, open sores, and certain bodily excretions.[15] See, e.g., J. Chan & E. Imwinkelried, "The Use of Forensic Entomology in Determining the Time of Death," 45 Crim. L. Bull. 121, 129 (2009); J. Dinulos, Cutaneous Myiasis, (last modified December, 2021), available at https://www.merckmanuals.com/home/skin-disorders/parasitic-skin-infections/cutaneous-myiasis (last visited August 2, 2022). Warrantless entry into the home "has been upheld even when the information reaching the police, if assessed in terms of probabilities, makes it much more probable that the victim is dead than that he is still alive." 3 W. LaFave, Search and Seizure (6th Ed. 2020) § 6.6 (a), p. 633. As long as there is a reasonable possibility that the person remains alive, the situation is an emergency because, in all likelihood, time is of the essence.

Courts have concluded that the discovery of other circumstances that may be suggestive of death will not necessarily render the emergency doctrine inapplicable.[16] See, e.g., *People* v. *McGee*, 140 Ill. App. 3d 677, 680–81, 489 N.E.2d 439 (1986) ("In Illinois, appellate decisions have applied the 'emergency' exception to the warrant requirement where [the] police entered a residence without a warrant while investigating a possible missing person and after detecting a stench they believed came from [a] dead body inside . . . and where [the] police investigating a report of a homicide observed from a window flies in one of the rooms. . . . In [one case], the court reasoned that the odor may have been caused by rotting flesh of a living person after severe burns or other injury, and the very uncertainty created by the totality of circumstances created a justification and need for the police to take immediate action. . . . In other jurisdictions, the odor of decomposing flesh or reliable information of death have been held to constitute an emergency situation sufficient to justify an immediate warrantless search of [the] premises because the apparent death may turn out to be a barely surviving life, still to be saved." (Citations omitted.)); *Smock* v. *State*, 766 N.E.2d 401, 404–405 (Ind. App. 2002) (rejecting argument that odor of decay precluded belief that someone was in need of aid because such facts show that fatality had already occurred and thus no exigent circumstances existed because presence of odor, along with other evidence indicating that tenant was missing, supported officers' "reasonable belief that someone may have been in need of immediate assistance"); *Hughes* v. *Commonwealth*, 87 S.W.3d 850, 852 (Ky. 2002) (rejecting argument that officer "should have

known when he smelled the odor of decomposing human remains that the victim was no longer in need of assistance"); *People* v. *Molnar*, 288 App. Div. 2d 911, 911–12, 732 N.Y.S.2d 788 (2001) (warrantless entry into defendant's apartment was justified under emergency exception when police detected foul odor, and, even though officers did not immediately recognize odor as that of decomposing body ultimately discovered, they forcibly entered apartment "to discover the source of the odor and to render aid if necessary"), aff'd, 98 N.Y.2d 328, 774 N.E.2d 738, 746 N.Y.S.2d 673 (2002); *Rauscher* v. *State*, 129 S.W.3d 714, 723 (Tex. App. 2004) ("even if [the officer] believed the foul odor to be that of a decomposing body, under the circumstances, [the officer] could have reasonably believed that [the victim] might still be alive, but in need of immediate emergency aid").

Although the defendant's mental condition did not indicate his need for emergency assistance, that condition nonetheless would have been a relevant factor in the officers' reasonable calculation of whether Samuolis needed such aid and what actions were necessary to provide that aid. The defendant's conduct in attempting to fortify the home against intruders and refusing to answer the door would have indicated to the officers that they were not going to be able to obtain timely information from the defendant about Samuolis' whereabouts or condition. The defendant's failure to remediate the fly infestation in plain view reasonably suggested that his mental disabilities may have impaired his capacity to appreciate the gravity of the conditions that existed and the need to elicit prompt medical assistance, if such assistance was required.

The defendant's mental condition also bears on the defendant's complaint that the officers' actions—driving to the scene without activating lights or sirens, and waiting for supervisor approval to conduct a warrantless search before entering the home—indicated that they did not perceive the situation as an emergency.[17] The officers clearly recognized the possibility, or even the likelihood, that entry into the home could lead to an encounter with a mentally ill individual who did not want them there. The fact that the responding officers waited a few minutes for their supervisor to arrive before entering must be viewed with that factor in mind. See *United States* v. *Jones*, 635 F.2d 1357, 1362 (8th Cir. 1980) ("[w]hen the police have a reasonable suspicion that someone is injured or that the public safety is in jeopardy, but refrain from taking immediate action in an effort to confirm or deny that suspicion, and then act once they have received no indication that the danger has dissipated, the waiting period does not defeat the applicable exception to the warrant rule"); see also id., 1361 ("[a]ny delay that occurred was primarily the result of careful police work").

The defendant nonetheless contends that the officers did not consider the "totality of circumstances," as they were required to do, because they failed to consider alternative explanations for the facts presented that would indicate that no emergency existed.[18] We disagree with the significance that the defendant ascribes to the "primary" facts that the officers did not consider—when Winkler climbed the ladder and looked in the window, he did not see anything amiss inside the house or smell an odor of decomposition. Winkler testified that it was difficult to see into the rear bedroom because it was so dark. Although Winkler was never asked whether he detected any odor, he testified that he never put any part of his body (presumably face included) into the window opening. The air freshener wedged in the small opening may have done its job of masking any odor emanating from inside the room. In fact, it was only after the third entry, when one of the officers was able to insert his upper torso into that room, that an odor of decomposition was detected.

The defendant also suggests that there were other reasonable explanations for the fly infestation: a dead animal (e.g., the cat that had been seen in the front window on the prior visit) or rotting food or garbage. The officers indicated in their testimony that they did not consider either scenario as a possible cause of the fly infestation because those explanations did not jibe with the conditions and the officers' past experience. We note that one would similarly expect an odor to be emitted from a dead animal or rotting food or garbage on a hot summer day. The defendant does not explain why it would have been reasonable for the officers to credit either of those explanations when they did not detect an odor but it was unreasonable for the officers to believe that there was an injured or dead person because they did not detect an odor of decomposition.

It defies common sense to conclude that, if there is any plausible, nonemergency explanation for the facts presented, no entry can be made until there is definitive proof that a person is present who is in need of emergency aid. The standard "must be applied by reference to the circumstances then confronting the officer, including the need for prompt assessment of sometimes ambiguous information concerning potentially serious consequences. As one court usefully put it, the question is whether the officers would have been derelict in their duty had they acted otherwise. This means, of course, that it is of no moment that it turns out there was in fact no emergency." (Footnotes omitted; internal quotation marks omitted.) 3 W. LaFave, supra, § 6.6 (a), pp. 629–31; see also *Michigan* v. *Fisher*, supra, 558 U.S. 49 ("[o]nly when an apparent threat has become an actual harm can officers rule out innocuous explanations for ominous circumstances"); *United States* v. *Cooks*, 920 F.3d 735, 743 (11th Cir.) ("we must be mindful that the

police must act quickly, based on hurried and incomplete information" (internal quotation marks omitted)), cert. denied,      U.S.     , 140 S. Ct. 218, 205 L. Ed. 2d 137 (2019). The defendant's position could prove especially deadly when an elderly person is the potential victim. See R. Gurley et al., "Persons Found in Their Home Helpless or Dead," 334 New. Eng. J. Med. 1710, 1710 (June, 1996) (study of patients found in their homes helpless determined that such circumstances increased with age and that total mortality was 67 percent for patients who were estimated to have been helpless for more than seventy-two hours, as compared with 12 percent for those who had been helpless for less than one hour).

We conclude that, under the totality of the circumstances, it was objectively reasonable for the officers to conclude that there was an emergency justifying their initial entry into the defendant's home. In light of this conclusion, the subsequent entries were similarly justified. We therefore need not consider the state's alternative arguments that the defendant's criminal conduct subsequent to the initial entry established an emergency that justified the subsequent entries or that the search and seizure were proper under the inevitable discovery or the independent source doctrines.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] Curtis unambiguously testified that he never saw anyone actually installing the chicken wire on the window. Winkler testified, however, that he received information from dispatch that "the neighbor had observed [the defendant] leaving the residence after law enforcement . . . left on Friday and then affixing chicken wire to the back windows . . . ."

[2] The officers also chose to enter through that upper floor window because doing so would cause the least amount of damage, only requiring them to cut the screen.

[3] The officers testified that they would have done things differently if they had been responding to an active crime.

[4] Testimony indicates that, at the time of the incident, at least two of the three officers believed that the defendant was the shooter.

[5] The trial court made generalized findings as to both of these matters, although the finding regarding the defendant's " 'mental issues' " was embedded in the trial court's legal conclusions. The defense did not attempt to discredit the testimony of any of the state's witnesses but, rather, focused on information that had not been ascertained or alternative explanations that had not been considered by the officers prior to entry into the home.

[6] Another requirement of the emergency exception is that "the search's scope and manner were reasonable to meet the need." (Internal quotation marks omitted.) *United States* v. *Ward*, 716 Fed. Appx. 682, 683 (9th Cir. 2018). See generally 3 W. LaFave, Search and Seizure (6th Ed. 2020) § 6.6 (a), p. 649 ("[a] warrantless search must be strictly circumscribed by the exigencies that justify its initiation" (internal quotation marks omitted)). The scope of the search is not challenged in the present case.

[7] See, e.g., *Sutterfield* v. *Milwaukee*, 751 F.3d 542, 558 (7th Cir.) (emergency aid doctrine "recognizes that police play a service and protective role in addition to a law enforcement role"), cert. denied, 574 U.S. 993, 135 S. Ct. 478, 190 L. Ed. 2d 362 (2014); *United States* v. *Najar*, 451 F.3d 710, 714–15 (10th Cir.) ("the emergency aid exigency emerged, informed by the practical recognition of critical police functions quite apart from or only tangential to a criminal investigation"), cert. denied, 549 U.S. 1013, 127 S. Ct. 542, 166 L. Ed. 2d 401 (2006); *State* v. *Kendrick*, 314 Conn. 212, 230, 100 A.3d 821 (2014) ("[t]he emergency doctrine . . . is rooted in the caretaking function of the police"); 3 W. LaFave, Search and Seizure (6th Ed. 2020)

§ 6.6 (a), p. 625 n.7 ("emergency aid exception is one of many community caretaking functions of the police" (internal quotation marks omitted)).

We note that there does not appear to be any material distinction between courts' use of the terms "emergency aid" doctrine or exception and "emergency" doctrine or exception.

[8] Although Justice Alito indicated in his concurring opinion in *Caniglia* that the court's exigency case law had not addressed a situation in which no warrant would have been available even if there had been time to get one, such as to check on a missing person's medical condition, he also expressed the view that courts could deem a warrantless entry under such circumstances reasonable under proper circumstances. *Caniglia* v. *Strom*, supra, 141 S. Ct. 1602 (Alito, J., concurring); see id. ("[p]erhaps [s]tates should institute procedures for the issuance of such warrants, but in the meantime, courts may be required to grapple with the basic [f]ourth [a]mendment question of reasonableness"); see also *Brigham City* v. *Stuart*, supra, 547 U.S. 403 ("the ultimate touchstone of the [f]ourth [a]mendment is 'reasonableness' ").

[9] In *Caniglia*, the police became involved in the matter after receiving a phone call from the petitioner's wife expressing concern that she had been unable to contact the petitioner at their home, that he possessed handguns, and that he had taken actions the prior evening that indicated that he might be suicidal. *Caniglia* v. *Strom*, supra, 141 S. Ct. 1598. The petitioner was on the porch of his home when the officers arrived to assess the situation. Id. He admitted to the officers that his wife had accurately reported his actions of the prior evening but denied that he was suicidal. Id. He agreed to be transported to a hospital for a psychiatric evaluation, allegedly subject to the officers' promise that they would not confiscate his guns. Id. After the petitioner left, however, the officers allegedly secured the wife's consent to enter the home without relaying the petitioner's wishes and removed two handguns. Id. In the decision that was the subject of the appeal, the United States Court of Appeals for the First Circuit expressed doubt that the emergency doctrine would have applied under these circumstances because of the absence of imminent harm. See *Caniglia* v. *Strom*, 953 F.3d 112, 122 n.5 (1st Cir. 2020), vacated on other grounds,      U.S.     , 141 S. Ct. 1596, 209 L. Ed. 2d 604 (2021).

[10] General Statutes § 17a-503 (a) provides: "Any police officer who has reasonable cause to believe that a person has psychiatric disabilities and is dangerous to himself or herself or others or gravely disabled, and in need of immediate care and treatment, may take such person into custody and take or cause such person to be taken to a general hospital for emergency examination under this section. The officer shall execute a written request for emergency examination detailing the circumstances under which the person was taken into custody, and such request shall be left with the facility. The person shall be examined within twenty-four hours and shall not be held for more than seventy-two hours unless committed under section 17a-502."

[11] The fact that the evidence suggested that the defendant was living in a house with a dead or decomposing body could reasonably indicate that the defendant was suffering from a serious psychological impairment. The question before us, however, is whether immediate warrantless entry into the home was justified to provide emergency aid or to prevent injury. We do not believe that the defendant's perceived condition warranted immediate entry under these parameters. Whether the emergency doctrine should be expanded beyond its current limitations to address the defendant's condition in the present case is a question with profound implications that we need not reach in light of our conclusion regarding Samuolis. See C. Slobogin, "Police as Community Caretakers: *Caniglia* v. *Strom*," 2020–2021 Cato Sup. Ct. Rev. 191, 193–94 (interpreting *Caniglia* to leave open possibility that some tasks that go beyond criminal law enforcement do permit warrantless entry, "even when there is time to get a warrant," but suggesting that, "given the potential for police misuse of force and for pretextual actions by the police, warrantless home entries in the absence of real exigency should never be part of policing's mission, even when a 'caretaking' goal can be articulated"); see also id., 194–95 (arguing that statistics show that having police, who are trained to use deadly force and have means to use it, as primary responder to person experiencing mental health crisis is wrong answer to problem).

[12] Entry into a home for the purpose of rendering emergency aid has been deemed reasonable in connection with a search for "an occupant *reliably* reported as missing." (Emphasis added.) 3 W. LaFave, Search and Seizure

(6th Ed. 2020) § 6.6 (a), pp. 638–39; see also *State* v. *Blades*, supra, 225 Conn. 619–20. There was no testimony in the present case indicating whether the officers obtained information from the neighbors reporting Samuolis' absence as to how well they knew Samuolis or the defendant, whether Samuolis had previously been absent for other similar periods of time, or what efforts they had made to make contact with Samuolis or to obtain other information that would validate their concern about his absence. In another case, this lacunae might be fatal. In the present case, it is not, most significantly because of the fly infestation.

We note that the evidence indicates that three neighbors spoke with the police to express concern about Samuolis' absence: Curtis, who lived next door to the Samuolis home, and Shirley Lebiszczak and Andy Lebiszczak, who lived directly across the cul-de-sac from the Samuolis home. Only Curtis testified. He stated that he had lived next door to the Samuolis family for seventeen years at the time of the incident. Curtis indicated that he had minimal direct contact with the family. In the three or four years preceding the incident, following the death of Samuolis' wife, Curtis would see Samuolis driving his car up the road once a week and returning thereafter with a cup of Dunkin' Donuts coffee. Curtis told the officers that he found it odd that the car had not been moved "for some time." It would be reasonable to infer from Curtis' testimony that the car had not been moved in the month or more during which Samuolis had not been seen. It also would be reasonable to infer from the fact that the neighbors were concerned enough about Samuolis' absence to ask the police to investigate that this extended absence was an anomaly.

[13] Winkler testified that one of the neighbors informed the officers that the parked car was the family's only vehicle.

[14] Neither party briefed the issue, before the trial court or this court, of whether a warrant, criminal or administrative, would have been available to retrieve a dead body. We note that there is a statute that provides in relevant part: "The body of each person who dies in this state shall be buried, removed or cremated within a reasonable time after death. The person to whom the custody and control of the remains of any deceased person are granted by law shall see that the certificate of death required by law has been completed and filed in accordance with section 7-62b prior to final disposition of the body. . . . Any person who violates any provision of this section shall be guilty of a class D felony." General Statutes § 7-64. It is unclear whether the criminal penalty applies exclusively to the person assigned custody of the body by law. There is also a statute that provides a penalty for failing to promptly notify the Office of the Chief Medical Examiner of "any death coming to their attention which is subject to investigation by the Chief Medical Examiner under this chapter . . . ." General Statutes § 19a-407; see also General Statutes § 19a-406 (a) (prescribing categories of death that chief medical examiner is required to investigate). The violation of a public health code also could justify issuance of an administrative warrant to inspect the property under General Statutes § 19a-220. See *State* v. *Saturno*, 322 Conn. 80, 93–94, 139 A.3d 629 (2016).

[15] Examples abound, sadly, in a cursory review of elder and child abuse cases. See, e.g., *Layne* v. *State*, 54 Ala. App. 529, 531, 310 So. 2d 249 (1975); *People* v. *Mattos*, Docket No. C076743, 2016 WL 158014, *1 (Cal. App. January 13, 2016), review denied, California Supreme Court, Docket No. S232311 (March 30, 2016); *Wolf* v. *State*, 246 Ga. App. 616, 616, 540 S.E.2d 707 (2000); *Hug* v. *State*, Docket No. 27A05-1410-CR-478, 2015 WL 1396263, *1 (Ind. App. March 25, 2015) (decision without published opinion, 31 N.E.3d 39); *Johnson* v. *State*, Docket No. W2020-00184-CCA-R3-PC, 2021 WL 4077030, *1–2 (Tenn. App. September 7, 2021).

[16] There are numerous cases in which courts have recognized that "apparent death may turn out to be barely surviving life, still to be saved." *State* v. *Epperson*, 571 S.W.2d 260, 264 (Mo. 1978), cert. denied, 442 U.S. 909, 99 S. Ct. 2820, 61 L. Ed. 2d 274 (1979); see also *Patrick* v. *State*, 227 A.2d 486, 489 (Del. 1967) ("[f]requently, the report of a death proves inaccurate and a spark of life remains, sufficient to respond to emergency police aid"). These spark of life cases typically involve a report of a dead body from laypersons, who lack medical knowledge to determine whether a person actually is dead or merely appears to be dead but could be revived with prompt medical treatment. See, e.g., *United States* v. *Stafford*, 416 F.3d 1068, 1074 (9th Cir. 2005) (911 call of possible dead body); *United States* v. *Richardson*, 208 F.3d 626, 631 (7th Cir.) (911 caller reported that woman had been raped and murdered), cert. denied, 531 U.S. 910, 121 S. Ct. 259, 148 L. Ed. 2d 188 (2000); *State* v. *Kraimer*, 99 Wis. 2d 306, 328, 298 N.W.2d

568 (1980) (although 911 caller reported that he had shot and killed his wife four days earlier, "the police had no way of knowing this as a verity"), cert. denied, 451 U.S. 973, 101 S. Ct. 2053, 68 L. Ed. 2d 353 (1981). An often quoted passage from former United States Supreme Court Chief Justice (then Judge) Burger in his opinion in *Wayne* v. *United States*, 318 F.2d 205 (D.C. Cir. 1963), cert. denied, 375 U.S. 860, 84 S. Ct. 125, 11 L. Ed. 2d 86 (1963), explains: "Acting in response to reports of 'dead bodies,' the police may find the 'bodies' to be common drunks, diabetics in shock, or distressed cardiac patients. But the business of policemen and firemen is to act, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process. Even the apparently dead often are saved by swift police response." (Emphasis omitted.) Id., 212. Of course, at some point, hope will be extinguished, and we reserve for another day the issue of whether the emergency doctrine remains applicable once a reasonable police officer would perceive no realistic possibility that the person remains alive.

[17] Rosado testified that the responding officers were required under Willimantic Police Department policy to obtain their supervisor's approval before entering a home. The facts to which the defendant points involve a delay of a few minutes; Rosado testified that it took him three or four minutes to drive to the scene. Testimony from the officers acknowledging that swifter action might have been taken had they believed that there was an active crime also does not negate the perceived emergency. During an active crime, the police may be seeking to protect someone from sustaining injury, or further injury, not to provide aid for an injury already sustained. As one court explained: "Not all emergencies are the same. In some, a person's life may hinge on the passage of mere seconds, demanding immediate police action. In others, police must act with reasonable swiftness but their response need not be calculated in seconds." *People* v. *Molnar*, 98 N.Y.2d 328, 333, 774 N.E.2d 738, 746 N.Y.S.2d 673 (2002); see also id., 334 ("It would be an ironic result were we to 'punish' the constabulary by suppressing the evidence merely because they took the time to exercise judgment and circumspection before resorting to force. The appropriately measured response of the police should not be declared illegal merely because they thoughtfully delayed entry for a relatively brief time.").

[18] The defendant also points to the fact that the officers did not attempt to obtain a telephone number for Samuolis and to call him before initially entering the home. One of the officers reasonably testified that they did not expect to get a response to a call into the house because no one responded to knocking or the officers' announcement of their presence. Although there is evidence that Frechette was able to locate a ten year old telephone number associated with the Samuolis family in the police database, he did not know whether the number was for a landline or a cell phone. Cf. *State* v. *DeMarco*, 311 Conn. 510, 527, 88 A.3d 491 (2014) (citing evidence that defendant's cell phone number was known to animal control officer, but officer did not have number with him when he called police headquarters to request backup to enter house). There was no evidence presented as to how readily that information could be accessed. Frechette could not have provided that information to the officers prior to the initial entry because he was not present at the police station when the officers entered the Samuolis home. Frechette received no answer when he repeatedly called that number following the officers' initial entry into the home. Although the better practice would have been for the officers dispatched for the well-being check to ask the neighbors whether they had a cell phone number for Samuolis, it is fair to infer that the neighbors did not because, if they had, they would have called it prior to reporting him missing and would have informed the police that he had not answered the call.