******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

## STATE OF CONNECTICUT *v.* SHAILA M. CURET
## (SC 20521)

Robinson, C. J., and McDonald, D'Auria,
Mullins, Ecker and Alexander, Js.

*Syllabus*

Convicted, on a conditional plea of nolo contendere, of the crime of possession of narcotics with intent to sell, the defendant appealed to the Appellate Court, claiming that the trial court improperly had denied her motion to suppress certain evidence seized by the police following their warrantless entry into her apartment. Z, a police officer, had been dispatched to an apartment building in which the defendant resided in response to a 911 call from C, a resident of the building, reporting gunshots and an attempted burglary. C reported seeing a man in a hooded shirt exit a vehicle outside the building and then hearing an altercation and gunshots. C also reported that the man in the hooded shirt then exited the building's front door and fled in the vehicle, that a second man exited the building's back door and fled in a different vehicle, and that, after they had left, C found a knife with white paint chips on it in the building's laundry room. When Z arrived, C gave Z the knife and recounted the incident. C stated to Z that he had seen the man in the hooded shirt enter the building, that he heard loud banging on the defendant's door, and that an altercation then occurred in the hallway in front of the defendant's apartment. According to C, the altercation moved into the laundry room, which was a few feet away from the defendant's apartment, before C heard gunshots and saw the man in the hooded shirt run out of the front door. Z then proceeded to investigate the building and, upon entering the laundry room, found, among other things, a spent shell casing, what appeared to be a bullet fragment embedded in a wall, a bullet hole in the molding around the laundry room's back door, and a fresh, blood like stain on the wall next to it. In the apartment building hallway, Z observed footprints on the wall across from the defendant's apartment, indicative of a struggle, white paint chips at the base of the defendant's door, and fresh pry marks on the door and doorframe. C informed Z that two people lived in the defendant's apartment and that he feared that one of them could have been involved in the altercation. C confirmed that the defendant's car was in the building's parking lot and expressed concern to Z that the defendant may be inside her apartment suffering from a gunshot or stab wound. Z then attempted to look inside the defendant's apartment through a window, but the blinds were drawn, and he received no response when he knocked repeatedly on the defendant's door. Concerned that someone inside might be injured, Z and his superior officer, without first obtaining a warrant, forced their way into the defendant's apartment. Although no one was found in the apartment, Z observed, in plain view, various drug paraphernalia. At that point, the search was stopped, and the police obtained a search warrant. A subsequent search yielded, inter alia, narcotics. After a hearing on the defendant's motion to suppress the narcotics seized from her apartment, the trial court denied the motion, concluding that the exigent circumstances and emergency aid doctrines justified the warrantless entry into the defendant's apartment. On appeal from the judgment of conviction, the Appellate Court reversed and remanded the case with direction to grant the defendant's motion to suppress, concluding that the exigent circumstances doctrine was inapplicable because there was no basis on which a reasonable police officer would believe that probable cause justified entry into the defendant's apartment and that the emergency aid doctrine was inapplicable because a reasonable police officer would not have believed that a medical emergency existed inside the apartment. On the granting of certification, the state appealed to this court.

*Held* that, although the Appellate Court correctly concluded that the exigent circumstances doctrine did not support the officers' warrantless entry into the defendant's apartment, it incorrectly concluded that the entry was not justified under the emergency aid doctrine, and, accordingly,

this court reversed the Appellate Court's judgment and remanded the case with direction to affirm the trial court's judgment:

The exigent circumstances doctrine applies exclusively to situations in which the police, acting in their crime fighting capacity, have probable cause to believe that a crime has been or is about to be committed and reasonably believe that, in the time it would take for them to obtain a warrant, the suspect would be able to destroy evidence, flee, or endanger the safety of others, whereas the emergency aid doctrine, which is rooted in the police's community caretaking function, does not require that the police have probable cause to enter a home if their purpose in doing so is to render emergency assistance, provided there is an objectively reasonable basis for believing that an occupant is seriously injured or is imminently threatened with serious injury.

The state did not claim that the police had probable cause to search the defendant's apartment for evidence or to make an arrest but, instead, argued on appeal that the warrantless entry was for the purpose of rendering medical aid to someone inside the apartment injured in the altercation overheard by C, and, accordingly, the warrantless entry was not supported by the exigent circumstances doctrine.

Although the police were acting in their crime control function when they arrived at the apartment building, it was apparent that, by the time they entered the defendant's apartment, they were acting pursuant to their community caretaking function, as the police were responding to reports of gunshots and an attempted burglary, and, in addition to the inherent risk of violence that generally accompanies burglaries, there were numerous signs of violence, including bullet holes, shell casings, and signs of a struggle that would have heightened the officers' concerns that someone may have been injured during the commission of the crimes in question, and, given the sequence of events reported by C, it was reasonable for the police officers to have believed that the person injured in the altercation was someone from the defendant's apartment who either interrupted an attempted burglary, was the intended victim of the burglary, or had some other reason to engage in an argument that spilled out into the hallway outside of the defendant's apartment and into the laundry room.

In evaluating the constitutionality of the warrantless entry under the emergency aid doctrine, the Appellate Court should have applied the reasonable belief standard, which is applied by reference to the circumstances then confronting the officers, including the need for prompt assessment of sometimes ambiguous information concerning potentially serious consequences, and which questions whether the officers would have been derelict in their duty if they had acted otherwise.

On the basis of the totality of the facts known to the police officers at the time of their entry, including the breaking and entering into the apartment building, the damage to and banging on the defendant's apartment door, the altercation in the hallway in front of the defendant's apartment, the gunshots, the blood stain, the knife, and the fact that, although the defendant's car was in the parking lot, she did not respond to Z's repeated knocking on her door, it was objectively reasonable for the officers to believe that someone inside the defendant's apartment was in need of emergency medical assistance, that immediate entry into the apartment was necessary to protect life, and that a failure to take such action would constitute a dereliction of duty.

Argued October 19, 2022—officially released March 7, 2023

*Procedural History*

Information charging the defendant with the crimes of possession of more than one-half ounce of cocaine and operation of a drug factory, brought to the Superior Court in the judicial district of Waterbury, geographical area number four, where the court, *Cremins, J.*, denied the defendant's motion to suppress certain evidence; thereafter, the state filed a substitute information charging the defendant with the crime of possession of narcotics with intent to sell; subsequently, the defendant

was presented to the court, *Fasano, J.*, on a conditional plea of nolo contendere to the charge of possession of narcotics with intent to sell; judgment of guilty in accordance with the plea, from which the defendant appealed to the Appellate Court, *Devlin* and *Bear, Js.*, with *Prescott, J.*, dissenting, which reversed the trial court's judgment and remanded the case with direction to grant the defendant's motion to suppress and to render judgment dismissing the charge of possession of narcotics with intent to sell, and the state, on the granting of certification, appealed to this court. *Reversed*; *judgment directed.*

*Michele C. Lukban*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Amy Sedensky*, senior assistant state's attorney, for the appellant (state).

*Emily H. Wagner*, assistant public defender, for the appellee (defendant).

*Opinion*

ALEXANDER, J. The state appeals[1] from the judgment of the Appellate Court reversing the conviction of the defendant, Shaila M. Curet, following her conditional plea of nolo contendere to the charge of possession of narcotics with intent to sell in violation of General Statutes (Rev. to 2015) § 21a-277 (a).[2] On appeal, the state claims that the Appellate Court incorrectly determined that the defendant's motion to suppress evidence seized by the police following a warrantless entry into her apartment should have been granted. We agree and reverse the judgment of the Appellate Court.

The following facts were either found by the trial court or are undisputed. On June 22, 2015, at approximately 3:26 p.m., Anthony Cruz telephoned the Waterbury police to report gunshots on the first floor of his apartment building at 130 Woodglen Drive in Waterbury. Cruz, who lived on the second floor of the building, told the 911 operator that, just before he heard the gunshots, he saw a white Kia pull up in front of the building and a Hispanic male wearing a light blue hoodie exit the vehicle. Cruz stated that "there must have been an altercation because we heard banging and stuff." Cruz further stated that, after the altercation, the man in the hoodie ran out of the front door of the building and jumped into the Kia, while a second man ran out the back door and got into a different vehicle. Both vehicles then sped away. Cruz told the operator that, when he and his friend went downstairs to investigate, they found a knife with white paint on it on the laundry room floor. They also saw white paint chips on the hallway floor in front of the defendant's apartment. Cruz informed the operator that it appeared that the man in the hoodie had used the knife to break into the building and then used it to try to break into the defendant's apartment. Specifically, Cruz stated: "[Y]ou can see the door that he tried to [enter] because I don't think these people are home. And you could see the door . . . the paint's all over and the knife's got white paint on it."[3]

Waterbury Police Officer Raim Zulali was dispatched to the scene at approximately 3:55 p.m. The information he was provided enroute to the call, which was displayed on a computer screen in his police vehicle, stated: "HM LSW LIGHT BLUE HOODIE TRIED TO BREAK INTO SOMEONE ELSES HOUSE AND THERE WAS [A LOT] OF NOISE COMING FROM LAUNDRY ROOM AND AN ALTERCATION WITH ANOTHER MALE BOTH PARTIES FLED // COMP[LAINANT] FOUNDKNIFE THAT [HM] GOT INTO THE BLDG WITH."

When Zulali arrived at the scene, Cruz let him into the building, gave him the knife he had found in the laundry room, and told him about the man in the blue hoodie. Cruz informed Zulali that, as the man approached

the building, he pulled his cap down over his eyes and his hood over his head as if trying to conceal his identity. After the man entered the building, Cruz heard loud banging on the door to the defendant's apartment, after which an altercation broke out in the hallway in front of the defendant's apartment. Cruz informed Zulali that the altercation then moved into the laundry room, which was right below Cruz' apartment and just a few feet away from the defendant's apartment. During the altercation, Cruz heard what he believed to be two gunshots. Cruz informed Zulali that, after hearing the gunshots, he saw the man in the hoodie run out of the front door of the building and drive away in the white Kia. At the hearing on the defendant's motion to suppress, Cruz clarified that, although he told the 911 operator that a second man had fled through the back door, he did not personally see that man. Cruz stated that someone he was with told him about the second man.[4]

While walking through the building, Zulali observed that the laundry room was in disarray, with the washing machines and dryers pushed out of place. The laundry room had two entrances, one facing the front of the building and one facing the back. On the floor near the back entrance, Zulali found a spent shell casing and a single flip-flop. He later found the matching flip-flop in the parking lot behind the building, near the back entrance. Zulali also observed a mark on the laundry room floor and what he believed to be a bullet fragment embedded in a wall. On the basis of his training and experience, Zulali believed that a bullet had ricocheted off the floor and hit the wall. Zulali observed a second bullet hole in the molding around the back laundry room door and a fresh, one-half centimeter, blood like stain on the wall next to it.

Moving from the laundry room into the back hallway, Zulali noticed footprints on the wall across from the defendant's apartment, suggestive of a struggle, and white paint chips at the base of the defendant's door. He also observed what appeared to be fresh pry marks on the defendant's door and in the doorjamb. Cruz informed Zulali that a man and woman lived in the defendant's apartment and that he feared that one of them could have been involved in the altercation. Zulali asked Cruz whether the couple's car was in the parking lot. Cruz looked outside and saw that it was, at which point he and Zulali exited the building to look at the car. While outside, Zulali tried to see inside the defendant's apartment, but the blinds were drawn. Because Cruz' apartment faces the front of the building, he was unaware when he called 911 that the defendant's car was in the parking lot behind the building. Upon seeing the car and recalling the altercation and gunshots, Cruz expressed concern to Zulali that the defendant could be "laying on her floor in her kitchen" suffering from a gunshot or stab wound.

At this point, Zulali called for backup. Officer Michael Gerrity was the first officer to respond to the scene. At Zulali's request, Gerrity asked the police dispatcher to contact area hospitals to determine if anyone had sought treatment for a gunshot or stab wound. While Gerrity secured the crime scene, Zulali canvassed the building to determine if everyone was okay and if anyone had seen or heard anything. Zulali managed to speak with all the building's residents except the occupants of the defendant's apartment, who did not respond to his repeated knocking. Most of the people Zulali spoke with seemed nervous and reluctant to share any information beyond assuring him that they were fine.

Concerned that someone inside the defendant's apartment had been injured in the altercation, Zulali tried to enter the apartment, but the door was locked. He then decided to force his way into the apartment. Before doing so, he called his superior officer, Sergeant Gaetano Tiso, to explain the situation to him. Tiso told him to wait until he got there before entering the apartment. When Tiso arrived a few minutes later, Zulali once again apprised him of the situation, the evidence he had discovered in the laundry room, and his concerns about the couple residing in the defendant's apartment. The decision was then made to enter the apartment using a battering ram that Tiso kept in his police vehicle. When the door was breached, it triggered the defendant's security alarm.

"After a search of the defendant's apartment, it was determined that no one was in the one bedroom apartment. While searching the apartment, Zulali observed in plain view two scales covered in white residue, clear plastic bags, and a safe in the closet. At this point, the search stopped, and a search warrant was sought for the items that were in plain view.

"When the police executed the search warrant, they seized a total of approximately 186 small plastic bags containing cocaine weighing 123.5 grams, 2 plastic bags containing cocaine weighing 43.8 grams, and $41,720 in cash. The defendant was arrested and charged with possession of more than one-half ounce of cocaine in violation of General Statutes [Rev. to 2015] § 21a-278 (a) and operation of a drug factory in violation of § 21a-277 (c)." *State* v. *Curet*, 200 Conn. App. 13, 20, 244 A.3d 927 (2020).

The defendant filed a motion to suppress the evidence seized from her apartment on the ground that the initial warrantless entry was not justified by any exception to the warrant requirement. The state opposed the motion, arguing that the exigent circumstances and emergency aid doctrines supported the warrantless entry because the police had probable cause to believe that someone inside the defendant's apartment was involved in a violent altercation during an attempted burglary. The state

further argued that, given the totality of facts known to the officers at the time of entry, it was reasonable for them to believe that a victim was inside the defendant's apartment suffering from a stab or gunshot wound.

The trial court denied the defendant's motion to suppress in an oral decision. The court agreed with the state that the exigent circumstances and emergency aid doctrines supported the warrantless entry because, based on the totality of facts known to the officers at the time of entry, it was objectively reasonable for them to believe that someone inside the defendant's apartment had been shot or stabbed in an attempted burglary of the defendant's apartment.

The defendant appealed to the Appellate Court, claiming that the trial court incorrectly had determined that the exigent circumstances and emergency aid doctrines supported the warrantless search of her apartment. Id., 16. In a divided opinion, the Appellate Court agreed with the defendant and reversed her conviction. Id. The Appellate Court concluded that the exigent circumstances doctrine was inapplicable because "there was no basis on which a reasonable officer would believe that probable cause justified entry [into the defendant's apartment] in pursuit of a suspect . . . ."[5] Id., 28. It also concluded that the emergency aid doctrine was inapplicable because a reasonable officer would not have believed that a medical emergency existed inside the apartment. Id., 31. In so concluding, the Appellate Court examined all the evidence the trial court had relied on in reaching a contrary conclusion and determined that none of it supported an objectively reasonable belief that someone from the defendant's apartment was involved in the altercation overheard by Cruz. See id., 31–32. The Appellate Court reasoned that, "although Cruz observed [two] individuals enter the building, there was no witness . . . who observed either individual enter the defendant's apartment; nor did a witness observe anyone emerge from the defendant's apartment to engage in the altercation. . . . Moreover, Zulali received information that two individuals had entered the building, engaged in an altercation, and then fled from the building in separate vehicles. Zulali was unaware of any evidence that a third party was involved in the altercation and remained in the building or was . . . in the defendant's apartment." Id., 33–34.

With respect to the blood stain, bullet holes, and shell casing recovered from the laundry room, the Appellate Court reasoned that, "[although] a reasonable officer . . . might likely conclude that there was an altercation in the laundry room and someone might have been injured in the laundry room as a result of the altercation," there was no evidence that, after the altercation, "[the] injured person . . . retreated to the defendant's apartment" in "a separate area of the building . . . ."

(Emphasis omitted.) Id., 35. "The most reasonable interpretation of the facts," the court concluded, "is that two men, after entering the building, unsuccessfully attempted to enter the defendant's apartment [and then fled]." Id., 40 n.6.

In reaching its decision, the Appellate Court distinguished three cases in which this court upheld a warrantless entry under the emergency aid doctrine. Id., 33–39; see *State* v. *DeMarco*, 311 Conn. 510, 538–40, 88 A.3d 491 (2014); *State* v. *Fausel*, 295 Conn. 785, 797–802, 993 A.2d 455 (2010); *State* v. *Blades*, 225 Conn. 609, 621, 626 A.2d 273 (1993). The Appellate Court interpreted these cases as requiring "substantial evidence . . . clearly demonstrating that someone was in danger of losing life or limb"; *State* v. *Curet*, supra, 200 Conn. App. 39; before a warrantless entry may be conducted pursuant to the emergency aid doctrine—evidence the Appellate Court found to be lacking in this case. Id., 39–40.

Judge Prescott dissented from the Appellate Court's opinion. He concluded that the clear and substantial evidence standard applied by the majority was not the correct legal standard for evaluating the constitutionality of a warrantless entry under the emergency aid doctrine. Id., 53 (*Prescott, J.*, dissenting). Contrary to the position taken by the majority, Judge Prescott observed, among other things, that the emergency aid doctrine does not require that an officer's belief concerning the existence of an emergency be the "most reasonable interpretation" of the evidence, only that it be an objectively reasonable interpretation. (Emphasis omitted; internal quotation marks omitted.) Id., 53 and n.12 (*Prescott, J.*, dissenting). Applying this standard, Judge Prescott concluded that Zulali's belief that someone inside the defendant's apartment might have been in need of medical assistance was as reasonable as the interpretation advanced by the majority, namely, that two men entered the building, unsuccessfully attempted to enter the defendant's apartment, fought one another in the hallway, and then fled in separate vehicles. See id., 49–50 (*Prescott, J.*, dissenting); see also id., 28–29. Judge Prescott noted that "Cruz was only an earwitness and never directly observed the altercation. Thus, the mere fact that, after the altercation ended, he saw two men fleeing the scene did not necessarily mean that there were only two persons present during the relevant events. Given the fact that Cruz heard loud banging on the defendant's apartment door immediately preceding the altercation, it [was] not unreasonable to infer that the altercation involved someone in the defendant's apartment who either interrupted an attempted burglary, was the intended victim of the burglary, or had some other reason to engage in an argument that spilled out into the hallway and into the laundry room." Id., 49 (*Prescott, J.*, dissenting).

Judge Prescott also disagreed with the majority that there was insufficient evidence connecting the defendant's apartment to the altercation in the laundry room. In his view, the officers reasonably could have concluded that "any party injured during the altercation could have fled from the laundry room back into the defendant's apartment, locking the door behind him or her. The pry marks on the doorframe of the defendant's apartment door and the paint chips further link the defendant's apartment to the altercation, either because the altercation began as a result of a break-in or an attempted break-in or because someone attempted to pursue a fleeing victim. In short, under the totality of the circumstances, it [was objectively] reasonable for officers to [believe] that someone shot, stabbed, or otherwise injured during the altercation could have sought refuge in the defendant's apartment and might be in need of medical attention. The fact that no one answered the door could have meant that the injured party had lost consciousness, making the need for an emergency warrantless entry that much more compelling."[6] Id., 50–51 (*Prescott*, *J.*, dissenting).

On appeal, following our grant of certification, the state challenges the Appellate Court's conclusion that the exigent circumstances and emergency aid exceptions to the warrant requirement did not support the warrantless entry into the defendant's apartment. The state contends that the Appellate Court, in reaching its conclusion, applied an incorrect legal standard, ignored the totality of the trial court's factual findings, and relied on numerous "factual inaccuracies . . . ." According to the state, the factual inaccuracies on which the Appellate Court relied include: (1) "Zulali received information that two individuals had entered the building, engaged in an altercation, and then fled from the building in separate vehicles"; *State* v. *Curet*, supra, 200 Conn. App. 34; (2) "Cruz observed [two] individuals enter the building"; id., 33; and (3) the defendant's apartment was in a "separate area of the building" from the laundry room. Id., 35.

The defendant disputes the state's assertion that the Appellate Court misapplied the law, ignored the trial court's factual findings, or based its decision on factual errors. The defendant argues that the Appellate Court simply recognized that the trial court's factual findings were "antithetical" to its legal determination that the warrantless entry was justified under the exigent circumstances and emergency aid doctrines. For the reasons set forth hereinafter, we agree with the Appellate Court that the exigent circumstances doctrine did not support the warrantless entry into the defendant's apartment. We disagree, however, that the entry was not supported by the emergency aid doctrine.[7]

The fourth amendment to the United States constitution provides that "[t]he right of the people to be secure

in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV. The United States Supreme Court has long held that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton* v. *New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). It is equally well settled that "the police may not enter the home without a warrant or consent, unless one of the [three] established exceptions to the warrant requirement is met. Indeed, [p]hysical entry of the home is the chief evil against which the wording of the fourth amendment is directed." (Internal quotation marks omitted.) *State* v. *Ryder*, 301 Conn. 810, 821, 23 A.3d 694 (2011). "The exigent circumstances doctrine is one of [the] three exceptions to the warrant requirement that are triggered by the need for swift action by the police. All three exceptions, the exigent circumstances doctrine, the protective sweep doctrine and the emergency [aid] doctrine, must be supported by a reasonable belief that immediate action was necessary." *State* v. *Kendrick*, 314 Conn. 212, 225, 100 A.3d 821 (2014).

The test for determining when exigent circumstances justify a warrantless search or seizure is "whether, under the totality of the circumstances, the police had reasonable grounds to believe that if an immediate arrest [or entry] were not made, the accused would be able to destroy evidence, flee or otherwise avoid capture, or might, during the time necessary to procure a warrant, endanger the safety or property of others. This is an objective test; its preeminent criterion is what a reasonable, [well trained] police officer would believe, not what the . . . officer actually did believe. . . . Put simply, given probable cause to arrest or search, exigent circumstances exist when, under the totality of the circumstances, the officer reasonably believed that immediate action was necessary to protect the safety of those present, or to prevent the flight of a suspect, or the destruction of evidence." (Citation omitted; internal quotation marks omitted.) Id., 227–28.

By contrast, "[t]he emergency [aid] exception to the warrant requirement allows [the] police to enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury. . . . The need to protect or preserve life or [to] avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. . . . As a result, the use of the emergency [aid] doctrine evolves outside the context of a criminal investigation and does not involve probable cause as a prerequisite for the making of an arrest or the search for and seizure of evidence. . . . [*United States* v. *Barone*, 330 F.2d 543, 545 (2d Cir.)

([t]he right of the police to enter and investigate in an emergency without the accompanying intent to either search or arrest is inherent in the very nature of their duties as peace officers, and derives from the common law), cert. denied, 377 U.S. 1004, 84 S. Ct. 1940, 12 L. Ed. 2d 1053 (1964)]. Nevertheless, the emergency [aid] doctrine does not give the state an unrestricted invitation to enter the home. [G]iven the rationale for this very limited exception, the state actors making the search must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat. . . . The police, in order to avail themselves of this exception, must have valid reasons for the belief that an emergency exists, a belief that must be grounded in empirical facts rather than subjective feelings . . . . It is an objective and not a subjective test. The test is not whether the officers actually believed that an emergency existed, but whether a reasonable officer would have believed that such an emergency existed." (Citations omitted; internal quotation marks omitted.) *State* v. *Fausel*, supra, 295 Conn. 794–95.

Any search conducted pursuant to the exigent circumstances or emergency aid exceptions must be "strictly circumscribed by the exigencies" that justified it. (Internal quotation marks omitted.) *Mincey* v. *Arizona*, 437 U.S. 385, 393, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978). The state bears the burden of demonstrating that a warrantless entry falls within one of the exceptions to the warrant requirement. See, e.g., *State* v. *Samuolis*, 344 Conn. 200, 214, 278 A.3d 1027 (2022).

Applying these principles, we agree with the Appellate Court that the warrantless entry was not supported by the exigent circumstances doctrine because the police lacked probable cause to search the defendant's apartment for evidence or to make an arrest. Probable cause is required under the exigent circumstances doctrine because this exception applies exclusively to situations in which the police, acting in their crime fighting capacity, *have probable cause* to believe that a crime has been or is about to be committed and reasonably believe that, in the time it would take for them to obtain a warrant, the suspect would be able to destroy evidence, flee, or endanger the safety of others. See, e.g., *State* v. *Kendrick*, supra, 314 Conn. 227–28. Indeed, the state does not claim otherwise. Rather, the state consistently has argued on appeal—first in the Appellate Court and now before this court—that the warrantless entry in the present case was justified for purposes of rendering medical aid to someone inside the defendant's apartment injured in the altercation overheard by Cruz.[8] The United States Supreme Court has explained that, if the officers' purpose in entering a home is to render emergency assistance, then they need not have probable cause to enter the home. See, e.g., *Michigan* v. *Fisher*, 558 U.S. 45, 47, 130 S. Ct. 546, 175 L. Ed. 2d 410 (2009)

(emergency aid doctrine "requires only an objectively reasonable basis for believing . . . that a person within [the house] is in need of immediate aid" (citation omitted; internal quotation marks omitted)). This is so because the "emergency aid doctrine has its roots in the police's caretaking function, as opposed to its law enforcement function . . . ." (Footnote omitted.) *State* v. *Samuolis*, supra, 344 Conn. 215.

We recognize that "it is not always a simple matter to delineate precisely pursuant to which function [the] police are acting in carrying out a particular search or seizure. In fact, we expressly have acknowledged . . . [that the] [p]olice often operate in the gray area between their community caretaking function and their function as criminal investigators. Often there is no bright line separating the one from the other . . . . In many instances, however, it is possible to discern whether the police are acting in their crime control or investigative functions, or instead are acting pursuant to their community caretaking function." (Citation omitted; internal quotation marks omitted.) *State* v. *Kendrick*, supra, 314 Conn. 233. This is one such instance.

Although there can be no doubt that the police were acting in their crime control function when they arrived at the building, it is equally apparent that, by the time they entered the defendant's apartment, they were acting pursuant to their caretaking role. This transition—from crime solving to caretaking—is a common one and is to be expected given the myriad situations officers confront when responding to a call and the "complex and multiple tasks" they are expected to perform when they do. (Internal quotation marks omitted.) *State* v. *Fausel*, supra, 295 Conn. 800–801. Because the police were acting in their caretaking role, the only issue is whether it was objectively reasonable for them to believe that someone inside the apartment was in need of emergency medical assistance. On the basis of the totality of facts known to the officers at the time of entry, we conclude that it was.

To begin with, the police were responding to reports of gunshots and an attempted burglary. In *Fausel*, this court held that "there are an infinite variety of situations in which entry for the purpose of rendering aid is reasonable. Included are those in which entry is made . . . *to seek possible victims of violence in premises apparently burglarized recently* . . . . 3 W. LaFave, Search and Seizure (4th Ed. 2004) § 6.6 (a), pp. 459–61. The rationale is that burglary is a crime of violence and bystanders are likely to be injured by the perpetrator. See *State* v. *Amado*, 254 Conn. 184, 201, 756 A.2d 274 (2000) (crimes against the person like . . . burglary are, in common experience, likely to involve danger to life in the event of resistance by the victim . . .)." (Emphasis in original; footnote omitted; internal quotation marks omitted.) *State* v. *Fausel*, supra, 295 Conn.

798–99; see also *United States* v. *Cooks*, 920 F.3d 735, 745 (11th Cir.) ("[i]nherent in a residential burglary is the risk that the homeowner will catch the perp[etrator] in the act and wind up a victim"), cert. denied, U.S. , 140 S. Ct. 218, 205 L. Ed. 2d 137 (2019); *Montanez* v. *Carvajal*, 889 F.3d 1202, 1210–11 (11th Cir. 2018) ("[B]ecause the [f]ourth [a]mendment has to be applied on the spur (and in the heat) of the moment, the object in implementing its command of reasonableness is to draw standards sufficiently clear and simple to [apply] . . . . Our holding—pursuant to which the burglary itself creates (or more accurately is) the exigency that justifies a limited warrantless entry to search for . . . victims—provides [the] police, citizens, and reviewing courts the sort of readily administrable standard that the [United States] Supreme Court has deemed essential in the [f]ourth [a]mendment context." (Citation omitted; emphasis omitted; internal quotation marks omitted.)); *Sandoval* v. *Las Vegas Metropolitan Police Dept.*, 756 F.3d 1154, 1163 (9th Cir. 2014) (for purposes of emergency aid doctrine, "burglary and attempted burglary are considered to carry an inherent risk of violence"), cert. denied, 574 U.S. 1153, 135 S. Ct. 1401, 191 L. Ed. 2d 360 (2015); *United States* v. *Castillo*, 48 Fed. Appx. 611, 613 (9th Cir. 2002) ("[t]he officers' initial entry into the apartment and search of the apartment . . . for a victim . . . were lawful under the emergency [aid] exception to the warrant requirement because the officers had received a burglary call, and upon arriving at the apartment, observed signs of a burglary"); *State* v. *Woods*, 136 N.C. App. 386, 391, 524 S.E.2d 363 ("[s]tate and federal courts . . . generally agree that [when] an officer reasonably believes that a burglary is in progress or has been recently committed, a warrantless entry of a private residence to ascertain whether . . . there are people in need of assistance does not offend the [f]ourth [a]mendment"), review denied, 351 N.C. 370, 543 S.E.2d 147 (2000).

Second, apart from the inherent risk of violence that accompanies every burglary, in the present case, there were numerous extrinsic signs of violence—bullet holes, shell casings, and obvious signs of a struggle in the hallway. This type of evidence would have only heightened the officers' concerns that someone may have been injured during the commission of the crimes in question. As Judge Prescott aptly observed, given the sequence of events reported by Cruz, which began with banging on the defendant's door, it was reasonable for the officers to believe that the person injured in the altercation was someone from the defendant's apartment "who either interrupted an attempted burglary, was the intended victim of the burglary, or had some other reason to engage in an argument that spilled out into the hallway and into the laundry room." *State* v. *Curet*, supra, 200 Conn. App. 49 (*Prescott, J.*, dissenting). Courts routinely have upheld warrantless entries under

comparable circumstances. See, e.g., *United States* v. *Huffman*, 461 F.3d 777, 784–85 (6th Cir. 2006) (officers responding to reports of gunshots at residence, who subsequently observed bullet holes in home's exterior and received no response after knocking on door, lawfully entered home under emergency aid doctrine to ensure nobody inside was injured), cert. denied, 549 U.S. 1299, 127 S. Ct. 1863, 167 L. Ed. 2d 353 (2007); *United States* v. *Holloway*, 290 F.3d 1331, 1332–33, 1338 (11th Cir. 2002) (When 911 caller reported gunshots and loud arguing, and shotgun casings were found outside home, "the officers reasonably believed an emergency situation justified a warrantless search of [the defendant's] home for victims of gunfire. The possibility of a gunshot victim lying prostrate in the dwelling created an exigency necessitating immediate search."), cert. denied, 537 U.S. 1161, 123 S. Ct. 966, 145 L. Ed. 2d 897 (2003); *People* v. *Lomax*, 975 N.E.2d 115, 125 (Ill. App.) (when police received multiple 911 calls complaining that gunshots had been fired in apartment and one call specified that shots had come from first floor rear unit, "[a]lthough the police had no specific details about the identity or appearance of either the shooter or any potential victim, the probability that someone had been shot was sufficient to create a reasonable belief that an emergency existed"), appeal denied, 981 N.E.2d 1001 (Ill. 2012), cert. denied, 569 U.S. 935, 133 S. Ct. 1835, 185 L. Ed. 2d 844 (2013).

In reaching a contrary conclusion, the Appellate Court reasoned that there was insufficient evidence connecting the altercation in the laundry room to the defendant's apartment, and, therefore, it was not objectively reasonable for the officers to believe that someone from the defendant's apartment was injured in that altercation. See *State* v. *Curet*, supra, 200 Conn. App. 28–29, 35. As the state argues, however, underpinning the Appellate Court's analysis were three factual inaccuracies: (1) the defendant's apartment was in a "separate area of the building" from the laundry room; id., 35; (2) "Zulali received information that two individuals had entered the building, engaged in an altercation, and then fled from the building in separate vehicles"; id., 34; and (3) "Cruz observed [two] individuals enter the building . . . ." Id., 33. On the basis of this information, the Appellate Court determined that it was unreasonable for Zulali to believe that anyone other than the two individuals observed by Cruz were involved in the altercation. See id., 34–35. The information the Appellate Court is referring to is the information Zulali received from the police dispatcher while en route to the scene. See id., 34. As the state argues, however, the dispatcher did not state that two individuals had entered the building. The dispatcher stated that *one* individual had attempted to break into an apartment, that an altercation ensued, and that, afterward, two persons were seen fleeing the building. Furthermore, at the hearing

on the motion to suppress, the trial court asked Cruz whether he personally had seen two men entering or exiting the building. Cruz responded that he had seen only one man, the man in the Kia, but "was told by somebody else" that a second man had left following the gunshots. Thus, contrary to the reasoning of the Appellate Court, Zulali was not informed that two individuals had entered the building, engaged in an altercation, and then fled in separate vehicles; nor did the trial court make any such findings.[9] The trial court found, rather, that, after the man in the Kia entered the building, Cruz heard pounding on the defendant's door followed by a fight in the hallway in front of the defendant's door. The trial court further found that the fight eventually spilled over into the laundry room, which, contrary to the assertion of the Appellate Court, was located "just a few feet away" from the defendant's apartment, not in a separate area of the building.[10] On the basis of this and other evidence, the trial court concluded that it was objectively reasonable for the officers to believe that someone from the defendant's apartment may have been injured during the altercation, "possibl[y] due to a shooting or a stabbing, and would be in need of immediate . . . medical attention."

Even if there was evidence to support the Appellate Court's theory "that two men, after entering the building, unsuccessfully attempted to enter the defendant's apartment"; *State* v. *Curet*, supra, 200 Conn. App. 40 n.6; it would not change our view of the reasonableness of the officers' belief that someone from the defendant's apartment was involved in the altercation. This is so because the Appellate Court's analysis does not account for the fact that the altercation was preceded by loud knocking on the defendant's door and began in the hallway in front of the defendant's apartment. If the two men who entered the building were acting in concert, as the Appellate Court's analysis at times would seem to suggest, and no one from the defendant's apartment was involved in the altercation, then who were the two men shooting at in the laundry room? We agree with Judge Prescott that an objectively reasonable interpretation of the evidence is that the two men were fighting with someone from the defendant's apartment after the defendant's door was opened—either forcibly by the intruders or voluntarily by someone inside the apartment in response to the loud knocking. See id., 49 (*Prescott, J.*, dissenting). Furthermore, because there was evidence that the intruders were carrying a firearm and a knife, it was reasonable for the officers to believe that, once the door was opened, anyone inside the apartment was at immediate risk of serious bodily injury.

We further agree with Judge Prescott that the quantum of evidence the Appellate Court required to justify a warrantless entry under the emergency aid doctrine—namely, "substantial evidence . . . clearly demonstrating that someone was in danger of losing life or limb";

id., 39; or "clearly demonstrat[ing] that there was a victim or bystander . . . injured [in the altercation]"; id., 34;—is not supported by the case law. See id., 53 and n.11 (*Prescott, J.*, dissenting). If this were the standard, then the police would never be permitted to enter a home without a warrant following a burglary. It is not the standard. "Officers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception," they need "an objectively reasonable basis for believing" that such emergency assistance is required. (Internal quotation marks omitted.) *Michigan* v. *Fisher*, supra, 558 U.S. 49; see also *State* v. *Fausel*, supra, 295 Conn. 800 ("we do not read [prior case law] to require direct evidence of an emergency situation" (internal quotation marks omitted)).

The reasonable belief standard "is a less exacting standard than probable cause";[11] *United States* v. *Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006); and "must be applied by reference to the circumstances then confronting the officer, including the need for prompt assessment of sometimes ambiguous information concerning potentially serious consequences. As one court usefully put it, the question is whether the officers would have been derelict in their duty had they acted otherwise. This means, of course, that it is of no moment that it turns out there was in fact no emergency. . . . 3 W. LaFave, [Search and Seizure (6th Ed. 2020)] § 6.6 (a), pp. 629–31; see also . . . *United States* v. *Cooks*, [supra, 920 F.3d 743] (we must be mindful that the police must act quickly, based on hurried and incomplete information . . .) . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Samuolis*, supra, 344 Conn. 227–28; see id., 227 ("[i]t defies common sense to conclude that, if there is any plausible, non-emergency explanation for the facts presented, no entry can be made until there is definitive proof that a person is present who is in need of emergency aid"); see also *Sutterfield* v. *Milwaukee*, 751 F.3d 542, 559 (7th Cir.) ("[w]hen [the] police are acting in a swiftly developing situation . . . a court must not indulge in unrealistic second-guessing" (internal quotation marks omitted)), cert. denied, 574 U.S. 933, 135 S. Ct. 478, 190 L. Ed. 2d 362 (2014); *State* v. *Ortiz*, 95 Conn. App. 69, 83, 895 A.2d 834 ("[t]he fact that a person in need of assistance was not present in the apartment does not in any way detract from the objectively reasonable interpretation of the facts that were before the police officers in their haste to render whatever assistance was necessary"), cert. denied, 280 Conn. 903, 907 A.2d 94 (2006).

Applying this standard, we conclude that the totality of facts known to the officers supported an objectively reasonable belief that someone inside the defendant's apartment was in need of emergency medical aid. The facts known to the officers included the breaking and entering into the building, the damage to the defendant's apartment door, the banging on the defendant's door,

the fight that broke out in front of the defendant's apartment, the gunshots, the blood stain, the knife, and the fact that, although the defendant's car was in the parking lot, she did not respond to the officers' repeated knocking on her door. With respect to this final fact, Cruz testified that, when he realized the defendant's car was in the parking lot, he informed Zulali of his growing concern for the defendant's welfare. We agree with the state that Zulali reasonably could have inferred from this that Cruz, a resident of the building, was sufficiently familiar with the defendant's comings and goings to associate the presence of her car with her being at home, thereby heightening the overall sense of urgency. In such circumstances, and taking into account all the other facts known to the officers, it was reasonable for the officers to believe that immediate entry into the defendant's apartment was necessary to protect life and that a failure to take such action would constitute a dereliction of duty.[12] For all of these reasons, we cannot agree with the Appellate Court that the emergency aid doctrine did not support the warrantless entry into the defendant's apartment.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion the other justices concurred.

[1] We granted the state's petition for certification to appeal, limited to the following issue: "Did the Appellate Court correctly conclude that the warrantless entry by the police into the defendant's apartment was not justified under the exigent circumstances doctrine or the emergency [aid] doctrine?" *State* v. *Curet*, 335 Conn. 969, 240 A.3d 287 (2020).

[2] Hereinafter, all references to § 21a-277 are to the 2015 revision of the statute.

[3] An audio recording of Cruz' 911 call was entered into evidence at the hearing on the defendant's motion to suppress and played for the trial court. A written transcript of the call was also entered into evidence. It provides in relevant part:

"[Cruz]: Hi operator. Operator, I'm up on 130 [Woodglen] Drive, Unit A. It has nothing to do with me, but we just almost caught someone trying to break into someone's apartment. We believe there was an altercation downstairs in the laundry room. We heard what we thought were shots. I have a knife here that they tried to work the door with. I have not touched it. I, you know, it was at the bottom of the door. And I seen this guy come in . . . a white Kia and, you know, [long sleeve] shirt—

"[The Operator]: Black, White or Hispanic?

"[Cruz]: I'm sorry, ma'am?

"[The Operator]: What race was he?

"[Cruz]: Um, Latino.

"[The Operator]: Hispanic male. And what did he have on?

"[Cruz]: It was like a powder blue, you know, like a light blue, powder blue hoodie. And it was kind of [silky like] looking—

"[The Operator]: So, a light blue hoodie?

"[Cruz]: Yes. But he left his hat here, so there must have been an altercation because we heard banging and stuff. I didn't know what it was at first. So—

"[The Operator]: So, he tried to break in?

"[Cruz]: He tried to break into someone else's house, ma'am. And, you know, when we went downstairs, we could hear something going on in the laundry room, then one ran out and jumped in the car, and another one came out from the back and jumped in another car, and they took off. But you can see the door that he tried to—because I don't think these people are home. And you could see the door there's been—the paint's all over, and the knife's got white paint on it. So, he holds this knife, this is how he got into the building. I seen him walk in, but I thought he was with somebody

. . . from the building because we got all kinds of crap going on—

"[The Operator]: So, he fled in a white Kia?

"[Cruz]: Yes, ma'am. . . .

"[The Operator]: All right. We'll get someone over there."

[4] At the hearing on the defendant's motion to suppress, the trial court pressed Cruz on whether he had seen two men exit the building on the day in question. Cruz responded that he had personally saw only one man, the man in the white Kia, enter and exit the building. Cruz explained that he had been told by a person he was with that a second man fled through the back door after the altercation. Although Cruz did not identify the person who had told him this, we assume it was the person Cruz referenced in his 911 call, when he told the operator, "[w]e believe there was an altercation downstairs in the laundry room. *We* heard what we thought were shots." (Emphasis added.) See footnote 3 of this opinion.

[5] The Appellate Court noted that, in evaluating the applicability of the exigent circumstances doctrine, the trial court had failed to address an essential component of that doctrine—namely, whether the police had probable cause to search the defendant's apartment. *State* v. *Curet*, supra, 200 Conn. App. 26 n.5; see also *State* v. *Kendrick*, 314 Conn. 212, 231, 100 A.3d 821 (2014) ("[a]lthough the exigent circumstances doctrine allows the police to act [on] their reasonable belief that immediate action is necessary to protect the safety of those present, or to prevent the flight of a suspect or the destruction of evidence, the police must have had probable cause for an arrest or search at the outset" (emphasis omitted)).

[6] Because Judge Prescott concluded that the officers' warrantless entry was justified under the emergency aid doctrine, he did not reach the issue of whether the police had probable cause to enter the apartment under the exigent circumstances doctrine. See *State* v. *Curet*, supra, 200 Conn. App. 40 n.1 (*Prescott, J.*, dissenting).

[7] "As a general matter, the standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . Accordingly, the trial court's legal conclusion regarding the applicability of the exigent circumstances doctrine is subject to plenary review." (Citation omitted; internal quotation marks omitted.) *State* v. *Kendrick*, 314 Conn. 212, 222, 100 A.3d 821 (2014).

[8] In its brief to the Appellate Court, the state argued that the search was supported by the exigent circumstances doctrine because it "pertained to a risk of danger to human life, *not pursuit of a suspect*." (Emphasis added.) *State* v. *Curet*, Conn. Appellate Court Briefs & Appendices, March Term, 2020, State's Brief pp. 18–19.

[9] In her brief to this court, the defendant insists that the trial court found that Cruz observed two men enter and leave the building and, further, that the trial court found that those men were the only individuals Cruz heard fighting in the laundry room. The defendant bases her argument on certain statements, taken out of context, that the trial court made during its oral ruling. In particular, the defendant relies on the trial court's statement, when summarizing Cruz' 911 call, that "Cruz eventually saw the male and the second male run out of the building and flee in separate vehicles." As we indicated, however, the trial court was aware that Cruz did not personally see two men run from the building. The transcript of the 911 call is ambiguous on this point, and the court sought clarification of it during the hearing on the motion to suppress. The defendant's assertions to the contrary notwithstanding, we do not read the trial court's ruling as limiting the number of individuals involved in the altercation to the two men seen leaving when it ended. Indeed, the trial court's ruling belies any such suggestion because the court concluded that it was objectively reasonable for the officers to believe that someone inside the defendant's apartment may have been shot or stabbed during the altercation and may have been in need of emergency medical assistance.

[10] Specifically, the trial court found that Cruz told Zulali that, "[a]fter the

male gained entry into the building, Cruz . . . heard someone knocking very hard [on] the [defendant's door]. Cruz was sure the knocking was on the [defendant's door]. Cruz then heard an altercation, which started in front of the hallway of [the defendant's apartment] and moved over to the laundry room . . . [which] was just a few feet away . . . ."

[11] "Probable cause, broadly defined, comprises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred." (Internal quotation marks omitted.) *State* v. *Blades*, supra, 225 Conn. 622.

[12] In the absence of any of the facts known to the officers, our decision might be different. Such is the nature of the fourth amendment totality of the circumstances inquiry, in which every factor is integral and often indispensable to the decision reached concerning the reasonableness of the challenged conduct. See, e.g., *United States* v. *Banks*, 540 U.S. 31, 36, 124 S. Ct. 521, 157 L. Ed. 2d 343 (2003) (reasonableness under fourth amendment is "a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of circumstances in a given case; it is too hard to invent categories without giving short shrift to details that turn out to be important in a given instance, and without inflating marginal ones").